# UNITED STATES ᴇᴛ ᴀʟ. *v.* LARIONOFF ᴇᴛ ᴀʟ.

No. 76–413.  Argued April 27, 1977—Decided June 13, 1977

*Deputy Solicitor General Jones* argued the cause for the United States et al. With him on the briefs were *Solicitor General McCree,* former *Acting Solicitor General Friedman, Acting Assistant Attorney General Babcock,* and *Robert E. Kopp.*

*Stephen Daniel Keeffe* argued the cause and filed a brief for respondents.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

Seven enlisted members of the United States Navy brought this class action in the District Court for the District of Columbia under the Tucker Act, 28 U. S. C. § 1346 (a)(2), alleging that their agreements to extend their enlistments, made at various times from 1968 to 1970, entitled each of them to payment of a re-enlistment bonus. The District Court ordered that the bonuses be paid, 365 F. Supp. 140 (1973), and the Court of Appeals for the District of Columbia Circuit affirmed. 175 U. S. App. D. C. 32, 533 F. 2d 1167 (1976). We granted certiorari, 429 U. S. 997 (1976). We affirm.

I

From early in our history, Congress has provided by statute for payment of a re-enlistment bonus to members of the Armed Services who re-enlisted upon expiration of their term of service, or who agreed to extend their period of service before its expiration.[1] Prior to the enactment of Pub. L. No. 89–132, 79 Stat. 547 (1965), this bonus was determined for an enlistee's first re-enlistment or extension of enlistment by multiplying his monthly pay at the time of expiration of the initial period

---

[1] The Court of Appeals opinion traces the history of this policy from 1795 to the present. 175 U. S. App. D. C., at 37–38, and n. 16, 533 F. 2d, at 1172–1173, and n. 16.

of service by the number of years specified in the re-enlistment agreement. See former 37 U. S. C. §§ 308 (a), (b).

The perceived defect of this system was that "it failed to vary the monetary incentive for reenlistment according to the needs of the armed services for personnel with particular skills." 175 U. S. App. D. C., at 38, 533 F. 2d, at 1173. Consequently, Congress enacted former 37 U. S. C. § 308 (g), which authorized the services to provide, in addition to the Regular Re-enlistment Bonus (RRB) just described, a Variable Re-enlistment Bonus (VRB) to members of the Armed Services whose particular skills were in short supply. The VRB was to be a multiple, no greater than four, of the RRB.[2]

This program was in effect when respondent Nicholas J. Larionoff enlisted in the Navy for four years on June 23,

---

[2] Former 37 U. S. C. § 308 (g), 79 Stat. 547, provided as follows:

"(g) Under regulations to be prescribed by the Secretary of Defense, or the Secretary of the Treasury with respect to the Coast Guard when it is not operating as a service in the Navy, a member who is designated as having a critical military skill and who is entitled to a bonus computed under subsection (a) of this section upon his first reenlistment may be paid an additional amount not more than four times the amount of that bonus. The additional amount shall be paid in equal yearly installments in each year of the reenlistment period. However, in meritorious cases the additional amount may be paid in fewer installments if the Secretary concerned determines it to be in the best interest of the members. An amount paid under this subsection does not count against the limitation prescribed by subsection (c) of this section on the total amount that may be paid under this section."

Under the Department of Defense regulations implementing the VRB program, multiples of one to four times the RRB were assigned depending on the relative urgency of the services' need for particular skills, as measured by personnel shortages and the cost of training replacement personnel. Department of Defense Directive 1304.14, ¶¶ IV.D.1.a, b (Sept. 3, 1970); Department of Defense Instruction 1304.15, ¶¶ IV.D, V.A.1, 2 (Sept. 3, 1970).

Under 37 U. S. C. § 906, "[a] member of the [Armed Forces] who extends his enlistment . . . is entitled to the same pay and allowances as though he had reenlisted."

1969.[3]  Shortly after his enlistment, Larionoff chose to participate in a Navy training program, completion of which would qualify him for the service rating "Communications Technician—Maintenance" (CTM).  At that time, as Larionoff was aware,[4] the CTM rating was classified by Navy regulations as a "critical military skill," whose holders were eligible upon re-enlistment or extension of enlistment for payment of a VRB in the amount of four times the RRB, the highest allowable rate.  Before entering the training program, which entailed a six-year service obligation, Larionoff entered a written agreement to extend his enlistment "in consideration of the pay, allowances, and benefits which will accrue to me during the continuance of my service."  Larionoff successfully completed the program and was advanced to the CTM rating, expecting to receive a VRB upon entering the period of his extended enlistment on June 23, 1973.[5]

---

[3] Except as noted below with specific reference to respondent Johnnie S. Johnson, the facts relating to Larionoff are typical of those concerning the other named respondents.

[4] Larionoff was informed of the existence of the VRB program, and its applicability to the CTM program, by a Navy "classifier" who interviewed him to determine what field within the service he should enter.  Several of the other named respondents were also told of the existence of the VRB program, and in some instances the amount of the VRB they could expect to receive was calculated for them by Navy personnel, without any indication that the amount might be reduced.  175 U. S. App. D. C., at 35, 36, and nn. 6, 11, 533 F. 2d, at 1170, 1171, and nn. 6, 11.  These facts, contained in affidavits filed by respondents, are undisputed; while an affidavit introduced by the Government states that "it is not the policy of the Department of the Navy to promise specific eligibility for Variable Reenlistment Bonus, nor is any official authorized to make such a promise in counselling with a prospective enlistee," there is no dispute that in particular cases individual service members might, inadvertently or otherwise, be left with the impression that a VRB had been promised.

[5] Under former 37 U. S. C. § 308 (g), the VRB was paid "in equal yearly installments in each year of the reenlistment period."

On March 24, 1972, however, the Navy announced that effective July 1, 1972, the CTM rating would no longer be considered a "critical military skill" eligible for a VRB. When Larionoff, through his congressional representatives, inquired into his continued eligibility for a VRB, he was informed that since the CTM rating was no longer listed, he would not receive the expected bonus. Accordingly, in March 1973, respondents filed this lawsuit, and in September of that year the District Court certified a class and granted summary judgment for respondents, ordering payment of the disputed VRB's.

While the Government's appeal of this order was pending in the Court of Appeals, Congress repealed the statutes authorizing both the RRB and the VRB, and substituted a new Selective Re-enlistment Bonus (SRB), effective June 1, 1974. Armed Forces Enlisted Personnel Bonus Revision Act of 1974, 88 Stat. 119, 37 U. S. C. § 308 (1970 ed., Supp. V). The Government concedes that this action had no effect on six of the named respondents; like Larionoff, they were scheduled to begin serving their extended enlistments prior to the effective date of the Act, and therefore should have received their VRB's, if at all, while the program was still in effect.[6] Respondent Johnnie S. Johnson, however, first enlisted in the Navy in August 1970, and did not begin serving his extended enlistment until August 1974. The Court of Appeals was thus confronted with two questions: (1) whether Larionoff and those in his position were entitled to receive VRB's despite the Navy's elimination of their rating from the eligible list in the period after their agreement to extend their enlistments but before they began serving those extensions; and (2) whether Johnson and others in his situation were entitled to receive VRB's despite the repeal of the VRB program in the same

---

[6] But see n. 23, infra.

period. The Court of Appeals held that both were entitled to receive VRB's.

## II

## A

Both the Government and respondents recognize that "[a] soldier's entitlement to pay is dependent upon statutory right," *Bell* v. *United States*, 366 U. S. 393, 401 (1961), and that accordingly the rights of the affected service members must be determined by reference to the statutes and regulations governing the VRB, rather than to ordinary contract principles.[7] In this case, the relevant statute, former 37 U. S. C. § 308 (g), provided:

> "Under regulations to be prescribed by the Secretary of Defense, . . . a member who is designated as having a critical military skill and who is entitled to [an RRB] upon his first reenlistment may be paid an additional amount not more than four times the amount of [the RRB]."

The regulations governing individual eligibility were set forth in Department of Defense Instruction 1304.15, ¶ V.B.1 (Sept. 3, 1970).[8]

---

[7] Indeed, this is implicitly recognized in the contracts executed by the named respondents, which state that they agree to extend their enlistments "in consideration of the pay, allowances, and benefits which will accrue to me during the continuance of my service," rather than stating any fixed compensation.

[8] This regulation provided:

"B. *Individual Eligibility for Receipt of Awards*

"1. *Variable Reenlistment Bonus.* An enlisted member is eligible to receive a Variable Reenlistment Bonus if he meets all the following conditions:

"a. Is qualified and serving on active duty in a military specialty designated under provisions of paragraph V.A.2. above for award of the Variable Reenlistment Bonus. Members paid a Variable Reenlistment Bonus shall continue to serve in the military specialty which

The Government contends that these eligibility criteria are to be applied as of the time the enlisted member completes service of his original enlistment and enters into the extended

---

qualified them for the bonus unless the Secretary of a Military Department determines that a waiver of this restriction is necessary in the interest of the Military Service concerned.

"b. Has completed at least 21 months of continuous active service other than active duty for training immediately prior to discharge, release from active duty, or extension of enlistment.

"c. Is serving in pay grade E–3 or higher.

"d. Reenlists in a regular component of the Military Service concerned within three (3) months (or within a lesser period if so prescribed by the Secretary of the Military Department concerned) after the date of his discharge or release from compulsory or voluntary active duty (other than for training), or extends his enlistment, so that the reenlistment or enlistment as extended provides a total period of continuous active service of not less than sixty-nine (69) months.

"(1) The reenlistment or extension of enlistment must be a first reenlistment or extension for which a reenlistment bonus is payable.

"(2) No reenlistment or extension accomplished for any purpose other than continued active service in the designated military specialty shall qualify a member for receipt of the Variable Reenlistment Bonus.

"(3) Continued active service in a designated military specialty shall include normal skill progression as defined in the respective Military Service classification manuals.

"e. Has not more than eight years of total active service at the time of reenlistment or extension of enlistment.

"f. Attains eligibility prior to the effective date of termination of awards in any military specialty designated for termination of the award. Member must attain eligibility prior to the effective date of a reduction of award level to be eligible for the higher award level. Eligibility attained through any modification of an existing service obligation, including any early discharge granted pursuant to 10 U. S. C. 1171, must have been attained prior to the date the authority approving the modification was notified of the prospective termination or reduction of award in the military specialty.

"g. Meets such additional eligibility criteria as may be prescribed by the Secretary of the Military Department concerned."

Instruction 1304.15 has been canceled by Department of Defense Instruction 1304.22 (June 1975).

enlistment. This is a reasonable construction, since the statute requires that the VRB not be paid until that time. See n. 5, *supra*. At that time, it is argued, respondents did not satisfy two related criteria prescribed by ¶ V.B.1, although it is conceded they met the others. First, they were not then "serving . . . in a military specialty designated" as a critical military skill, ¶ V.B.1.a, since the CTM rating was by that time no longer so designated; second, they had not "[a]ttain[ed] eligibility prior to the effective date of termination of awards" for the CTM rating. ¶ V.B.1.f.

The Government also relies upon the regulations governing the amount of the award to be received. Under Department of Defense Directive 1304.14, ¶ IV.F (Sept. 3, 1970):

> "When a military skill is designated for reduction or termination of award an effective date for reduction or termination of awards shall be established and announced to the field at least 90 days in advance. *All awards on or after that effective date in military skills designated for reduction of award level will be at the level effective that date and no new awards will be made on or after the effective date in military skills designated for termination of awards."* [9] (Emphasis added.)

Similarly, Department of Defense Instruction 1304.15, *supra*, ¶ VI.A, stated:

> "Members serving in a military specialty designated for reduction or termination of award under the provisions of subsection IV.F. of [Directive 1304.14, *supra*] will receive the award level effective on the date of their reenlistment or extension of enlistment, except as provided in paragraph V.B.1.f. above." [10]

---

[9] Directive 1304.14 has been canceled by Department of Defense Directive 1304.21 (June 1975).

[10] The reference is apparently to the last sentence of ¶ V.B.1.f, *supra*, n. 8, which provided: "Eligibility attained through any modification of an existing service obligation . . . must have been attained prior to

The Government argues that these regulations, read together, establish that respondents were entitled to receive only the VRB in effect for their service rating at the time the period of their original enlistment ended, and the extended enlistment began.

These regulations, as the Court of Appeals pointed out and the Government freely concedes, contain a number of ambiguities. See 175 U. S. App. D. C., at 40–42, 533 F. 2d, at 1175–1177. We need not tarry, however, over the various ambiguous terms and complex interrelations of the regulations. In construing administrative regulations, "the ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Bowles* v. *Seminole Rock Co.*, 325 U. S. 410, 414 (1945). See also *INS* v. *Stanisic*, 395 U. S. 62 (1969). The Government represents, and respondents do not seriously dispute, that throughout the period in which the VRB program was in effect, the Navy interpreted the Department of Defense regulations as entitling an enlisted member who extends his enlistment to the VRB level, if any, in effect at the time he began to serve the extended enlistment.[11] Since this interpre-

---

the date the authority approving the modification was notified of the prospective termination or reduction of award . . . ." The Court of Appeals interpreted this provision as intended to prevent service members from qualifying for a soon-to-be-reduced benefit level by agreeing to extend their enlistments in the interval between the announcement of the reduction in award level and the effective date of the change, and hence an implicit recognition that in the absence of such a provision service members in that position would be entitled to the higher benefit level. 175 U. S. App. D. C., at 41–42, 533 F. 2d, at 1176–1177. The Government argues, however, that the purpose of ¶ V.B.1.f was to reach the much smaller group of service members who would be in a position both to agree to extend their enlistment and to begin serving the extension within the relevant period. Tr. of Oral Arg. 15–16.

[11] This has apparently been the practice regardless of whether that level was higher or lower than that in effect when the service member agreed to extend his enlistment. *Id.*, at 45.

tation is not plainly inconsistent with the wording of the regulations, we accept the Government's reading of those regulations as correct.

## B

This, however, does not end our inquiry. For regulations, in order to be valid, must be consistent with the statute under which they are promulgated.[12] We are persuaded that insofar as they required that the amount of the VRB to be awarded to a service member who extended his enlistment was to be determined by reference to the award level in effect at the time he began to serve the extension, rather than at the time he agreed to it, the relevant regulations were contrary to the manifest purposes of Congress in enacting the VRB program, and hence invalid.[13]

The legislative history of the VRB statute makes those congressional purposes crystal clear. As noted above, the re-enlistment bonus scheme in effect before 1965, which relied entirely on the RRB, was criticized for providing the same re-enlistment incentive to all members of the Armed Services, regardless of the need for their skills. The Defense Department desired greater flexibility in calibrating re-enlistment incentives to its manpower needs. The additional expendi-

---

[12] "The power of an administrative officer or board to administer a federal statute and to prescribe rules and regulations to that end is . . . [only] the power to adopt regulations to carry into effect the will of Congress as expressed by the statute. A regulation which does not do this, but operates to create a rule out of harmony with the statute, is a mere nullity." *Manhattan General Equip. Co.* v. *Commissioner,* 297 U. S. 129, 134 (1936). See, *e. g., Ernst & Ernst* v. *Hochfelder,* 425 U. S. 185, 213–214 (1976); *Dixon* v. *United States,* 381 U. S. 68, 74 (1965).

[13] This argument was clearly raised in the briefs in the Court of Appeals, Brief for Plaintiffs-Appellees (Cross-Appellants) 13, *Larionoff* v. *United States,* Nos. 74–1211 and 74–1212, and in this Court, Brief for Respondents 15–18. We therefore do not regard the somewhat inconclusive colloquy at oral argument, see Tr. of Oral Arg. 29–33, as abandoning it.

tures for the VRB were expected to save money in the long run, since payment of the higher re-enlistment bonus would enable the Armed Forces to retain highly skilled individuals whose training had required a considerable investment.[14] Members of Congress in the floor debates clearly recognized the wisdom of offering such incentives.[15]

The VRB was thus intended to induce selected service members to extend their period of service beyond their original enlistment. Of course, the general pay raise for the military included in the same Act was also intended to have a similar effect, by making a military career generally more attractive.[16] But the VRB was expected to be a very specific sort of incentive, not only because it was aimed at a selected group of particularly desirable service members, but also because it offered an incentive "at just the time that it will be most effective, when an individual decides whether or not to reenlist." Remarks of Rep. Nedzi, 111 Cong. Rec. 17201 (1965). The then Secretary of Defense, Robert S. McNamara, made the same point to the House Armed Services Committee, in contrasting the VRB to "proficiency pay," which provides increased pay to service members with critical skills:

> "We believe a more efficient way to provide additional reenlistment incentives to selected first termers in especially high demand is by using a variable reenlistment bonus. *Monetary rewards are thereby concentrated at the first reenlistment decision point, obtaining the greatest return per dollar spent on the retention of personnel.*" Hearings on Military Pay Bills before the House Commit-

---

[14] H. R. Rep. No. 549, 89th Cong., 1st Sess., 47 (1965); S. Rep. No. 544, 89th Cong., 1st Sess., 14 (1965).

[15] See, *e. g.*, remarks of Rep. Morton, 111 Cong. Rec. 17206 (1965); remarks of Rep. Bennett, *ibid.;* remarks of Rep. Dole, *id.,* at 17209; remarks of Sen. Russell, *id.,* at 20034.

[16] See, *e. g.*, H. R. Rep. No. 549, *supra,* at 5–6; S. Rep. No. 544, *supra,* at 1–4.

tee on Armed Services, 89th Cong., 1st Sess., 2545 (June 7, 1965) (House Hearings). (Emphasis added.)

The then Assistant Secretary of Defense, Norman S. Paul, also distinguished the VRB from ordinary pay, stating that with the VRB the military hoped "to cure a separate specific problem by specific means, rather than overall pay." Hearings on Military Pay Increase before the Senate Committee on Armed Services, 89th Cong., 1st Sess., 41 (July 29, 1965) (Senate Hearings). The timing of the VRB was crucial to this intention:

> "At the end of his first term of reenlistment [*sic*] he is trying to make up his mind whether to stay in the military. And we think that the added bonus may push him over the line into staying with us, which is what we want to see happening." *Id.*, at 40.[17]

It is true that in discussing the VRB, Congress focused on the service member who reaches the end of his enlistment, and is faced with the decision "whether or not to *reenlist.*" (Emphasis added.) Remarks of Rep. Nedzi, *supra.* But, as Congress has recognized in providing that "[a] member of the [Armed Forces] who extends his enlistment . . . is entitled to the same pay and allowances as though he had reenlisted," 37 U. S. C. § 906, precisely the same reasoning applies to the decision to extend enlistment as to the decision to re-enlist. In either case, the VRB could only be effective as a selective incentive to extension of service if at the time he made his

---

[17] The argument that the VRB would be particularly effective as an inducement to re-enlist because it would be provided at the "decision point" is a constant theme through the hearings, the committee reports, and the floor debates. See House Hearings 2545–2584 (statements of Secy. McNamara), 2671 (colloquy of Rep. Stratton and Gen. Greene); Senate Hearings 19 (statement of Secy. McNamara), 26, 40, 44 (statements of Asst. Secy. Paul); H. R. Rep. No. 549, *supra,* at 47; S. Rep. No. 544, *supra,* at 14; 111 Cong. Rec. 17201 (1965) (remarks of Rep. Nedzi).

decision the service member could count on receiving it if he elected to remain in the service.

This is very apparent when the VRB program is examined from the perspective of an individual who is at the point of deciding whether or not to extend an enlistment due to expire at some future date. At the time he makes this decision, he is aware that his rating or expected rating is classified as a critical military skill eligible for a VRB at a particular level. Under the plan as envisioned by Congress, and as applied by the Navy in the case of re-enlistments, the incentive operates "at just the time it will be most effective," because the service member knows that if he remains in the service, he will receive a VRB at the prescribed level. But under the contested regulations, the service member has no such reassurance. Whether or not his rating is eligible for a VRB now, it may not be at the future date on which his first enlistment expires.[18] His "incentive" to extend his enlistment is the purely hypothetical possibility that he might receive a VRB if there is a personnel shortage in his skill on that date. On the other hand, if he nevertheless extends his enlistment, and if the VRB level for his rating is increased in the interval before his original term expires, he will receive a higher award than that which sufficed to induce his decision to remain in the service—from the standpoint of Congress' purposes, a totally gratuitous award.[19]

---

[18] Indeed, as the Court of Appeals pointed out, 175 U. S. App. D. C., at 43–44, n. 32, 533 F. 2d, at 1178–1179, n. 32, because the regulations governing the VRB program required the various services to undertake an annual review of the military specialties in which personnel shortages existed for the purpose of adjusting VRB award levels, Department of Defense Directive 1304.14, ¶ IV.F.1, the service member, by his very decision to extend his enlistment, would contribute to the likelihood that by the time his initial enlistment expired, his skill would no longer be in short supply and the VRB he had expected would therefore have been reduced or eliminated.

[19] The effects of the challenged regulations would, of course, be less than

The clear intention of Congress to enact a program that "concentrates monetary incentives at the first reenlistment decision point where the greatest returns per retention dollar can be expected," Senate Hearings 26 (statement of Asst. Secy. Paul), could only be effectuated if the enlisted member at the decision point had some certainty about the incentive being offered. Instead, the challenged regulations provided for a virtual lottery.[20] We therefore hold that insofar as the Defense Department regulations required that the amount of the VRB to be paid to a service member who was otherwise eligible to receive one be determined by the award level as of the time he began to serve his extended enlistment, they are in clear conflict with the congressional intention in enacting the VRB program, and hence invalid. Because Congress intended to provide at the re-enlistment decision point a promise of a reasonably certain and specific bonus for extending service in the Armed Forces, Larionoff and the members of his class are entitled, as the Court of Appeals held, to payment of VRB's determined according to the award levels in effect at the time they agreed to extend their enlistments.

---

clear to the service member deciding whether or not to extend his enlistment, and, given the complexity and ambiguity of the regulations, and the resulting possibility that they could be misconstrued by Navy recruiters as well as by the enlistees themselves, it would not be surprising if many service members, like some of the respondents here, see n. 4, *supra*, came to believe that by extending their enlistments they had acquired a vested right to a VRB. To the extent that such beliefs had been fostered, upholding the regulations would perpetrate a considerable injustice.

[20] Of course, the enlisted service member agreeing to extend his enlistment could not have been entirely certain of the amount of his future VRB. First, the VRB was calculated according to a formula based on the amount of the RRB, which in turn depended on the re-enlistee's basic pay upon entering the re-enlistment period. At the time he agreed to extend his enlistment, the service member could not have been sure what that amount would be; Congress could alter military pay scales, or the member might be promoted or demoted, and hence his pay might change,

## III

This brings us to the further question of respondent Johnson's entitlement to a VRB. At the time he agreed to extend his enlistment, the VRB program was in effect, and his CTM rating was classified as a critical military skill. Before he began serving the extended enlistment period, however, Congress repealed the RRB and VRB system, and substituted the new SRB. 88 Stat. 119, 37 U. S. C. § 308 (1970 ed., Supp. V). The Government contends that since the VRB had been abolished before Johnson became eligible to receive one, he is not entitled to receive a bonus. The Court of Appeals rejected this argument.[21]

What we have said above as to Larionoff goes far toward answering this question. The intention of Congress in enacting the VRB was specifically to promise to those who

---

in the interval. Second, the VRB, by both statute and regulation, was not actually paid until the service member began serving his extended enlistment, and even then was ordinarily paid in yearly installments. If for some reason the enlistee did not complete service of his extension, remaining installments were not paid, and overpayments were recouped. Department of Defense Directive 1304.14, ¶ IV.G. Finally, receipt of any VRB at all depended on the service member's completing the requirements for eligibility before expiration of the original enlistment. See Department of Defense Instruction 1304.15, ¶ V.B.1, n. 8. Thus, the VRB as applied to service members extending their enlistments, as opposed to those re-enlisting, was always somewhat contingent. But there is a significant difference between this sort of contingency, which was inherent in the nature of the program and in any event involved marginal effects on the amount of the award or the occurrence of rather speculative events, and the sort of uncertainty the contested regulations inject into the program, which rendered the primary determinant of the VRB entirely unpredictable at the time the decision to extend enlistment was made.

[21] The decision of the Court of Appeals on this point is in conflict with the decisions in *Collins* v. *Rumsfeld*, 542 F. 2d 1109 (CA9 1976), cert. pending *sub nom. Saylors* v. *United States*, No. 76-677; and *Carini* v. *United States*, 528 F. 2d 738 (CA4 1975), cert. pending, No. 75-1695.

extended their enlistments that a VRB award would be paid to them at the expiration of their original enlistment in return for their commitment to lengthen their period of service.[22] When Johnson made that commitment, by entering an agreement to extend his enlistment, he, like Larionoff, became entitled to receive at some future date a VRB at the award level then in effect (provided that he met the other eligibility criteria). Thus, unless Congress intended, in repealing the VRB program in 1974, to divest Johnson of the rights he had already earned, and constitutionally could do so, the prospective repeal of the program could not affect his right to receive a VRB, even though the date on which the bonus was to be paid had not yet arrived.

Of course, if Congress had such an intent, serious constitutional questions would be presented. No one disputes that Congress may prospectively reduce the pay of members of the Armed Forces, even if that reduction deprived members of benefits they had expected to be able to earn. Cf. *Bell* v. *United States,* 366 U. S. 393 (1961); *United States* v. *Dickerson,* 310 U. S. 554 (1940). It is quite a different matter, however, for Congress to deprive a service member of pay due for services already performed, but still owing. In that case, the congressional action would appear in a different constitutional light. Cf. *Lynch* v. *United States,* 292 U. S. 571 (1934); *Perry* v. *United States,* 294 U. S. 330 (1935). In view of these problems, we would not lightly conclude, in the absence of a clear expression of congressional intent, that in amending 37 U. S. C. § 308 and establishing a new bonus system, Congress intended to affect the rights of those service members who had extended their enlistments and become entitled to receive VRB's.

Nothing in the language of the 1974 Act or its legislative history expresses such an intention. The Act makes no refer-

---

[22] As noted, n. 20, *supra,* the precise amount of the award remained somewhat uncertain, and the award was contingent on the enlisted member's meeting certain eligibility conditions.

ence whatever to service members who have become entitled to payment of a VRB by extending their enlistments. There is no prohibition of further payments of VRB's to those already entitled to them; [23] the Act simply replaces the old § 308 with a new one that authorizes SRB's rather than RRB's and VRB's. Nor does the legislative history express any intention to effect such a prohibition. No paramount power of the Congress or important national interest justifying interference with contractual entitlements is invoked.

The Courts of Appeals that have upheld the Government's position have relied on two indications of a congressional intent to affect the rights of Johnson and his class. First, the 1974 Act expressly preserves the right of all service members on active duty as of the effective date of the Act to receive upon re-enlistment the RRB's they would have been entitled to before passage of the Act. Pub. L. No. 93–277, § 3,[24] 88

---

[23] The Government's concession that the 1974 Act does not affect respondents other than Johnson implicitly admits that the Act permits such payments. Three other named respondents entered their two-year extension periods after June 1, 1973. Since the VRB was paid in yearly installments, n. 5, *supra*, these three would presumably still have installments due on their VRB after the Act became effective on June 1, 1974.

[24] This section provides:

"Notwithstanding section 308 of title 37, United States Code, as amended by this Act, a member of a uniformed service on active duty on the effective date of this Act, who would have been eligible, at the end of his current or subsequent enlistment, for the reenlistment bonus prescribed in section 308 (a) or (d) of that title, as it existed on the day before the effective date of this Act, shall continue to be eligible for the reenlistment bonus under that section as it existed on the day before the effective date of this Act. If a member is also eligible for the reenlistment bonus prescribed in that section as amended by this Act, he may elect to receive either one of those reenlistment bonuses. However, a member's eligibility under section 308 (a) or (d) of that title, as it existed on the day before the effective date of this Act, terminates when he has received a total of $2,000 in reenlistment bonus payments, received under either section 308 (a) or (d) of that title as it existed on the day before the effective date of this Act, or under section 308 of that title, as amended by this Act, or from a combination of both."

Stat. 121. The failure to include a similar saving clause as to VRB's, it is argued, indicates that Congress intended to abolish them entirely. But the saving clause for RRB's does not merely preserve them for those who had already extended their enlistments, but assures RRB's upon re-enlistment to any service member then on active duty. The failure to enact a similar provision as to VRB's indicates only that Congress did not intend that VRB's be paid to those service members who re-enlisted after the effective date of the Act, and has no bearing on those who had already extended their enlistments and become entitled to VRB's.

Second, reference is made to a portion of the Conference Report on the Act, indicating a congressional "understanding" that service members, like Johnson, who had already entered two-year extensions of enlistment could become eligible for an SRB by canceling the extension and replacing it with a four-year extension. H. R. Conf. Rep. No. 93–985, pp. 4–5 (1974).[25] This, it is argued, indicates that Congress had

---

[25] The relevant portion of the Conference Report referred to in the text states:

*"Clarification of interpretation of bill language*

"The House committee in reporting the bill indicated its intention that bonuses not be authorized for personnel for existing obligated service. There was brought to the attention of the conferees a problem that would exist, particularly in the Navy nuclear-power field, under the House interpretation of the language of the bill. In cases where commitment has been made to a man with a four-year enlistment and a two-year extension he can cancel the two-year extension and reenlist for four years and receive a reenlistment bonus for the four-year reenlistment. The Navy expressed great concern that the language of the bill might be interpreted to require it to abrogate an understanding it had with enlistees and would operate in such a way as to cause serious retention problems in its most critical career field. The conferees, therefore, want it understood that while it normally does not expect bonuses to be paid for services for which there was an existing obligation, it is consistent with the conferees' understanding that full entitlement to SRB will be authorized for personnel who have already agreed to an extension period prior to the

considered the possible unfairness that eliminating the VRB could work on members such as Johnson, and felt that it had made sufficient provision for them by making them eligible, upon a further extension of their commitment, for an SRB. But the Report does not refer to the possible unfairness of eliminating the VRB payable to those service members with whom it deals; rather, it refers to the Navy's concern that language in the legislative history might cast doubt on a commitment the Navy had made "to a man with a four-year enlistment and a two-year extension that he can cancel the two-year extension and reenlist for four years and receive a reenlistment bonus for the four-year reenlistment." *Id.*, at 4. The Report removes any doubts about the validity of that commitment. The only relevance of the Report to the problem before us is that it demonstrates that Congress was responsive to the "concern that the language of the bill might be interpreted to require it to abrogate an understanding" between the Armed Forces and enlistees, *ibid.*, making it less rather than more likely that Congress intended the 1974 Act to abrogate Johnson's entitlement to a VRB by implication.

*Affirmed.*

MR. JUSTICE WHITE, with whom THE CHIEF JUSTICE, MR. JUSTICE BLACKMUN, and MR. JUSTICE REHNQUIST join, dissenting.

Like the Court, I accept the Government's interpretation of the relevant Navy Department regulations, but I do not agree

---

enactment of the legislation if they subsequently cancel this extension prior to its becoming operative and reenlist for a period of at least two years beyond the period of the canceled extension. Nothing in the bill should operate to deny the Chief of Naval Operations the authority to extend SRB entitlement to nuclear-power operators, if they subsequently can cancel any outstanding extension period prior to its becoming operative and reenlist for a period of at least two years beyond the period of the canceled extension."

with the majority's view that because Congress intended by the VRB legislation irrevocably to promise a re-enlistment bonus to those who agreed in advance to re-enlist the regulations are invalid. As I see it, the legislation was not part of the re-enlistment agreement, which was executed in consideration of the pay, allowances, and benefits that would accrue during a continuance of the re-enlistee's service. Those who executed re-enlistment agreements had no vested right in any particular level of pay, in any particular allowance or benefit, or in any particular total package of pay, allowances, or benefits. In this respect, I am in essential agreement with Judge Haynsworth's opinion for the Court of Appeals for the Fourth Circuit in *Carini* v. *United States*, 528 F. 2d 738 (1975), which concluded that cancellation of the VRB prior to the beginning of a re-enlistment period was not forbidden by law. I respectfully dissent.