**UNITED STATES of America, Plaintiff,**

v.

**Sherri Anne TURNER, M.D., Defendant.**

**No. CV–85–0138.**

United States District Court,
E.D. New York.

May 5, 1987.

Andrew J. Maloney, U.S. Atty., E.D. N.Y., Brooklyn, N.Y. by Kiyo A. Matsumoto, Asst. U.S. Atty., for U.S.

Sherri Anne Turner, M.D., pro se.

## MEMORANDUM AND ORDER

SIFTON, District Judge.

This is an action for damages arising from defendant's alleged breach of two scholarship agreements made pursuant to the Public Health Service ("PHS") Scholarship Training Program, 42 U.S.C. § 234 (repealed 1976), and the National Health Service Corp ("NHSC") Scholarship Program, 42 U.S.C. § 254*l*–*o*. Defendant is a medical doctor who practices general medicine and who appears in this action *pro se*.[1] The matter is before the Court on plaintiff's motion for an order pursuant to Rule 56 granting plaintiff summary judgment in the amount of $109,396.79. Plaintiff seeks restitution of the scholarship monies and accrued interests under both agreements as well as treble damages for the amount received under the NHSC Scholarship Program pursuant to 42 U.S.C. § 254*o*.

Except where indicated, the following facts are undisputed.

On June 15, 1977, while attending Tufts University Medical School, defendant applied for enrollment in the PHS Scholarship Training Program. The PHS Scholarship Training Program was established by Congress to assure an adequate supply of trained physicians, dentists, and nurses in certain medically underserved areas of the United States. In exchange for scholarship benefits, including payment of tuition and a stipend, scholarship recipients agree to serve a "period of obligated service" in the NHSC, providing clinical medical services in health manpower shortage areas designated by the Secretary of Health and Human Services.

On September 21, 1977, defendant was awarded a scholarship for the period beginning July 1, 1977 and ending June 30, 1978. The award provided for payment of a $6,750 stipend, paid in $750 monthly installments, and a $5,425 tuition grant.

The Notice of Scholarship Award signed by defendant set forth certain "Conditions of Award." These conditions provided in pertinent part:

"1. This award is made upon the condition that the awardee agree to fulfill the service obligation as specified by Section 225 of the Public Service Act and implemented in the governing regulations (42 C.F.R. Part 62) as follows:

"(a) A scholarship recipient is obligated to serve on active duty for one year as a Commissioned Officer in the Public Health Service or as a civilian member of the National Health Service Corps following completion of academic training, for each academic year of support.... Provided, however, that in no event shall a recipient serve less than two years.

\*    \*    \*    \*    \*    \*

"2. (2) If, for any reason a participant fails to complete an active duty service obligation, such participant shall be liable for the payment of an amount equal to the scholarship payments, tuition and other educational fees paid, plus interest at the maximum legal prevailing rate running from the date such payments were made."

The notice of award also provided that the service obligation could be deferred for one year for graduates who seek to pursue an internship or equivalent training.

Effective October 1, 1977, the Health Professions Educational Assistance Act of 1976 replaced the PHS Scholarship Train-

---

1. Defendant stated in her deposition that she has also received training as a lawyer. As of October 1985, it was her intention to graduate from St. John's University Law School in January 1986.

ing Program with the NHSC Scholarship Program.[2] In March or April 1978, defendant received a memorandum from the Chief of the PHS and NHSC programs, as well as an applicant information bulletin explaining the changes that had been made by Congress and the terms for scholarship awards for the 1978–79 academic year. On April 19, 1978, defendant signed an NHSC Scholarship Program contract, pursuant to which she received an award of $6,507 for tuition and fees and a $6,648 stipend.

The terms and conditions stated in the NHSC scholarship agreement were substantially the same as those set forth in the PHS program contract, except for changes in the default and deferment provisions.

With respect to breach, section C of the contract states, in accordance with 42 U.S.C. § 254o:

"If the applicant fails to begin or complete the period of obligated service incurred under this contract for any reason . . . the United States shall be entitled to recover an amount equal to three times the scholarship funds awarded, plus interest as determined by the formula $A = 3\phi t - s$ in which:
$$\frac{}{t}$$

'A' is the amount the United States is entitled to recover,

'$\phi$' is the sum of the amounts paid to or on behalf of the applicant and the interest on such amounts which would be payable if at the time the amounts were paid they were loans bearing interest at the maximum legal prevailing rate, as determined by the Treasurer of the United States,

't' is the total number of months in the applicant's period of obligated service, and

's' is the number of months of such period served by the applicant in accordance with Section 752 of the Public Health Service Act.

"The amount the United States is entitled to recover shall be paid within one year of the date the Secretary determines that the applicant has failed to begin or complete the period of obligated service."

With respect to deferment, section A(2) of the contract obligated the Secretary to grant participants with a degree in medicine, osteopathy or dentistry a maximum three-year deferment for completion of an internship, residency of other advanced clinical training, if so requested by the participant.

The bulletin and memorandum further explain that a participant who has received benefits under both programs, but who fails to begin his service obligation will be subject to the treble damage provisions contained in the NHSC program agreement only with respect to funds received under the NHSC program. The bulletin also contained the following description of the new deferment requirements:

"Participants receiving degrees in medicine or osteopathy must complete at least one year of internship or equivalent training to be eligible for Commissioned Corps or Civil Service appointment in the NHSC. The service obligation will be deferred for completion of this training. If this one-year option is exercised and a longer period of time is not requested for postgraduate training, the year must be satisfied by a flexible first year of clinical training, a categorical first year of a family practice, internal medicine, or pediatrics program, or in a rotating internship in osteopathic medicine.

"Participants who complete non-primary care residencies in three years or less will most likely be utilized by the NHSC as general medical practitioners with limited opportunity to practice their specialties. Participants should consider postponing non-primary care residence training until they have completed the Scholarship Program service obligation."

The bulletin also noted that final regulations implementing the NHSC Scholarship Program had not been published in the Federal Register and that applicants would

---

**2.** Prior to signing the notice of award under the PHS program, defendant was sent an information bulletin from HEW advising all applicants of the legislative change. The bulletin stated that participants who receive funds under both the PHS and NHSC programs would be obligated to comply with certain provisions of the new law. The bulletin specifically stated that training deferments would be governed solely by the provisions of the NHSC program. The bulletin also warned that new default penalties had been enacted providing for failure to fulfill the service obligation. A second memorandum, dated August 19, 1977, was sent to each applicant further advising them that if they wished to receive benefits for the 1978–79 academic year they would be required to sign a new contract based upon the provisions of the NHSC program.

be notified immediately of any changes that may result from publication of the final regulations. The final regulations were not actually published until September 27, 1978.

On October 16, 1979, during the fall of her final year of medical school, defendant telephoned James L. Goff, Chief of Deferment for the NHSC program and indicated a desire to pursue a surgical internship. Mr. Goff reiterated the restrictions on the types of programs that may qualify for a deferment and warned defendant that entering a surgical internship might result in her default. The defendant replied that she felt that the requirements were overly restrictive and that she intended to contact an official at the NHSC to protest the requirements.

On May 1, 1980, the Secretary granted defendant a one-year deferment, but only for the types of programs listed in the bulletin and 42 C.F.R. § 62.9(b). However, due to the large number of participants who desired surgery internships, defendant was informed by letter dated May 28, 1980, that the Secretary would now approve deferments for general surgery internships on the condition that the participant complete a three-month primary care rotation and submit a signed statement by a medical director that this requirement would be satisfied. Scholarship recipients were further advised that if they entered surgical residencies and failed to satisfy this condition they would be subject to default.

On November 14, 1980, defendant, having failed to submit any of the required documents, was sent a letter stating that if she failed to submit the requested documentation by December 8, 1980, she would be considered in default. On January 5, 1981, defendant, still having failed to submit a copy of her training contract or a statement from her program director, was declared in default.

At her deposition, defendant testified that she completed a one-year internship program at Montefiore Hospital. Defendant stated that during the first six months she specialized in general surgery, but during the second six months she specialized in general medicine and she finished with an internship in "surgery/general medicine." Defendant also testified that during the summer of 1981 she spoke by telephone with an NHSC representative and informed her that she had in fact completed an internal medicine internship and inquired about a position with the NHSC to fulfill her service obligation. Defendant claims that the NHSC representative stated that due to cutbacks it was unlikely that any positions were available and that in any event defendant was in default for failing to pursue and complete a primary care residency.

Apparently, there were no further communications between the parties until defendant was mailed a certificate of indebtedness dated July 19, 1984. The certificate stated that as a result of her breach under the PHS and NHSC loans she owed plaintiff $92,207.67 as of that date. On September 28, 1984, plaintiff filed the instant action.

Plaintiff argues that under the governing statutes and regulations defendant has breached the terms and conditions of her scholarship awards in two respects. First, plaintiff claims that defendant breached the terms of her deferment by failing to pursue a surgery internship that included a three-month rotation in primary care as required by the NHSC's letter of May 28, 1980. Second, plaintiff contends that defendant breached the terms of her deferment by failing to submit documentation regarding the status and curriculum of her internship as required by 42 C.F.R. § 62.9 and the NHSC's letter of May 28, 1980. Accordingly, plaintiff seeks to invoke the default provisions contained in both the PHS and NHSC program agreements.

Defendant, in response, raises numerous affirmative defenses. First, she argues that the government unconstitutionally impaired her PHS Scholarship Training Program contract by "modifying" the deferment and default provisions for the 1978–79 academic year. Second, defendant contends that the 1978–79 NHSC contract is void on the grounds of economic duress. Third, she seeks to exclude all "extrinsic" documents describing the deferment re-

quirements on the ground that they were not incorporated into the NHSC contract. Alternatively, she argues that the provisions contained in these documents are ambiguous. Fourth, defendant seeks to avoid compliance with the final NHSC Scholarship Program regulations on the ground that they were not published until after the 1978–79 agreement was executed. Finally, defendant contends that the treble damages provision of her 1978–79 contract is unenforceable as a penalty.

## DISCUSSION

Federal Rule of Civil Procedure 56(c) states that summary judgment is appropriate wherever "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." The moving party has the burden of establishing the absence of genuine factual issues, *Schering Corp. v. Home Insurance Co.*, 712 F.2d 4, 9 (2d Cir.1983), and the court must "resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought." *Beacon Enterprises, Inc. v. Menzies*, 715 F.2d 757, 762 (2d Cir.1983). To defeat a motion for summary judgment, however, the opposing party may not rest upon the conclusory allegations or denials set forth in the pleadings, but must set forth specific facts showing that there is no genuine issue for trial. Rule 56(e); *Schering, supra* at 9.

Applying these standards to the present case, I conclude for the reasons set forth below that plaintiff is entitled to summary judgment.

### Constitutionality of the 1978–79 NHSC Scholarship Program Agreement

■ Defendant contends that the new deferment requirements and treble damage provisions contained in the 1978–79 NHSC agreement and regulations unconstitutionally alter and impair the contractual rights and obligations to which she assented when she applied for benefits under the PHS Scholarship Training Program. Although mistakenly relying on the contract clause, which by its terms applies only to the

states, defendant essentially argues that these new conditions, unilaterally imposed by the federal government, violated her due process rights under the fifth amendment. *See Lynch v. United States*, 292 U.S. 571, 579–80, 54 S.Ct. 840, 843–44, 78 L.Ed. 1434 (1934).

In response, plaintiff argues that the new legislation does not amount to a due process violation since the obligations and rights of parties to "contracts" of this sort are statutory rather than contractual in nature and may be constitutionally altered by the government to effect the purposes of the program. *See, e.g., Hahn v. United States*, 757 F.2d 581 (3d Cir.1985); *Aiken v. United States*, 4 Cl.Ct. 685 (1984). *See also FHA v. The Darlington*, 358 U.S. 84, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958); *American Hospital Ass'n v. Schweiker*, 721 F.2d 170 (7th Cir.1983); *Wyoming Hospital Ass'n v. Harris*, 727 F.2d 936 (10th Cir. 1984).

The Claims Court's recent decision in *Aiken, supra*, makes clear that defendant's purely contractual approach is inappropriate in the circumstances of this case. Like the present case, *Aiken* also involved a challenge to requirements imposed upon PHS scholarship recipients. There, a scholarship recipient under the PHS program sued the government for breach of contract on the ground that under the NHSC program he would not receive credit towards his service obligation for any period of internship or residency performed at a PHS or NHSC facility. Under his initial agreement with the PHS, such service would have been credited.

Contrary to the approach argued by both parties, the court declined to view either plaintiff's application for scholarship or the notice of scholarship award as establishing contractual rights or obligations. Rather, the court held that the parties' rights and obligations were based solely on a statutory foundation. 4 Cl.Ct. at 692. Moreover, pursuant to the presumption that Congress had not intended to create any private contractual or vested rights when it created the PHS program, *see Dodge v. Board of Education*, 302 U.S. 74, 78–79, 58

S.Ct. 98, 100, 82 L.Ed. 57 (1937), the court concluded that "Congress was legally free to alter, amend or repeal [its legislative scheme] even if plaintiff would be deprived of some future benefit as a result of said repeal, and even if plaintiff had taken action he would not have taken had he been able to foresee that a repeal would be forthcoming." *Id.* Since the law itself did not create any vested rights and since plaintiff breached the agreement before he graduated—when at least the right might have theoretically vested—the court granted summary judgment for the government.

A recent decision by the Third Circuit Court of Appeals in *Hahn v. United States*, 757 F.2d 581 (3d Cir.1985), further confirms the appropriateness of a statutory approach. *Hahn* also involved a challenge to legislative changes in the NHSC Scholarship Program. There, a plaintiff class of participants in the NHSC program who planned to become commissioned medical or dental officers of the PHS [3] brought suit challenging a provision of the Defense Officer Personnel Management Act of 1980 which denied class members "constructive service credit" for their professional education in the calculation of their basic pay. Prior to the effective date of the Act, commissioned officers were entitled to receive "constructive service credit" of up to four years for their medical training.

In discussing the merits of plaintiff's due process claims,[4] the court, at considerable length, distinguished the Supreme Court's decision in *United States v. Larionoff*, 431 U.S. 864, 97 S.Ct. 2150, 53 L.Ed.2d 48 (1974). In *Larionoff*, the Supreme Court held that enlisted members of the United States Navy were entitled to a re-enlistment bonus despite the fact that Congress had changed the bonus system after they had decided to re-enlist but before their reenlistment period had begun. The Court found that by entering an agreement to extend their enlistment, plaintiffs at that point became entitled to a bonus at some future date. To divest plaintiffs of the rights they had already earned, assuming it was otherwise constitutional to do so, would require a "clear expression of congressional intent." Noting that on the facts before it serious constitutional questions would arise if Congress possessed such intent, the Court found no evidence of such "clear expression" and accordingly upheld plaintiffs' right to the bonus.

In distinguishing *Larionoff*, the court in *Hahn* noted that at the time scholarship recipients apply for or enter the program they make no commitment to become officers of the PHS Commissioned Corps, nor can the Secretary force them to serve the obligated time as commissioned officers. Rather, this decision is made near the end of the participant's medical training, and, although the prospect of becoming commissioned officers may have induced plaintiffs to join the NHSC Scholarship Program, the court failed to find anything resembling the *quid pro quo* that was crucial to the *Larionoff* decision. *Id.*

Like the plaintiffs in *Hahn*, and unlike the plaintiffs in *Larionoff*, defendant here cannot make out a claim that she has "earned" a vested right to a deferment for the internship of her choice or to the default provision in effect at the time she signed the scholarship contract. When plaintiff entered the PHS Scholarship Program, she made no commitment to pursue any particular internship or residency. Nor was such a commitment ever required since an internship is purely voluntary under the statutory scheme. When the changes brought on by the NHSC program went into effect, plaintiff still had yet to complete her professional training and apply for internships. Although plaintiff might have presented a closer case if she

---

3. One of the ways in which a scholarship recipient may meet his or her service obligation is to serve as a commissioned officer of the Regular or Reserve Corps of the PHS. 42 U.S.C. § 254d(a)(1). The PHS is considered a "uniformed service," and compensation for its members is governed by the same basic laws as for members of the armed services. *Id.* at 584.

4. The plaintiff class also raised a breach of contract claim. In a footnote, however, the court specifically stated that it interpreted the district court's opinion as applying a statutory analysis, and the Court of Appeals proceeded to do the same. *Id.* at 591–92 n. 8.

had already selected an unauthorized internship, it is clear that at the time the NHSC program went into effect plaintiff had not become statutorily entitled to a particular deferment or default scheme.[5] Thus, the type of clear expression of congressional intent required by *Larionoff* to "divest" plaintiff of those rights was not required. Moreover, since plaintiff had not earned any vested rights, Congress was free to amend the statutory scheme to effect the purposes of the program without running afoul of the due process clause. *See Aiken, supra,* 4 Cl.Ct. at 692; *see also FHA v. The Darlington, supra,* 358 U.S. at 91, 79 S.Ct. at 146; *American Hospital, supra,* 721 F.2d at 182–84.[6]

### Economic Duress

Defendant asserts that the new requirements imposed by the terms of her 1978–79 scholarship award are voidable on the ground of economic duress. She argues that since she had already committed herself to two years of obligated service under her 1977–78 PHS program agreement she was faced with no choice but to accept the new terms of her NHSC scholarship award. Moreover, she asserts that at the time she was required to either accept or decline the new terms she was under great financial strain in the midst of a demanding school year.

As discussed above, defendant's traditional contractual analysis is undermined by the fact that the terms of her agreement were dictated by applicable federal statutes and regulations. However, even assuming *arguendo* that a traditional contractual analysis is appropriate, it is clear that defendant has failed to make out a valid claim of economic duress.

█ In order to void an agreement on the ground of economic duress, "it must be shown that the party's manifestation of assent was induced by an improper threat which left the recipient with no reasonable alternative save to agree." *David Nassif Assoc. v. United States,* 644 F.2d 4, 12, 226 Ct.Cl. 372 (1981). That is, some wrongful conduct on the part of the government must be shown, and the mere stress of one's financial condition will not amount to duress unless the government was somehow responsible for that condition. *See Johnson Drake & Piper, Inc. v. United States,* 531 F.2d 1037, 1042–43, 209 Ct.Cl. 313 (1976).

█ Based upon these standards, it is clear that there was no duress inflicted here. First, no evidence has been adduced that the government made any threats or engaged in other wrongful conduct to coerce defendant into continuing her participation under the NHSC program. The March 1978 program memorandum clearly advised defendant that if she "elected" to participate in the program for the 1978–79 school year she would be eligible for priority consideration for an award under the NHSC Scholarship Program. Indeed, defendant admits that she received notice of impending changes in the program and the need to sign a new contract with the NHSC prior to deciding to join the PHS program in 1977.

The fact that defendant was already committed to two years of obligated service cannot, by itself, constitute a threat or duress since, contrary to defendant's contention, the Secretary was not obligated by the terms of the PHS scholarship agree-

---

**5.** The relationship between the alleged inducement—here, the availability of surgical internships and low default penalties—and defendant's commitment is even further attenuated by the fact that defendant admits that she received notice prior to signing her initial agreement that she would be subject to new deferment and default provisions if she chose to continue receiving benefits for the 1978–79 academic year which she thereafter did.

**6.** Plaintiff relies on the fact that several cases involving suits under the PHS and NHSC pro-

grams apply the federal common law of contracts in interpreting the parties' rights and obligations. *See, e.g., United States v. Bills,* 639 F.Supp. 825 (D.N.J.1986); *United States v. Hayes,* 633 F.Supp. 1183, 1185 (M.D.N.C.1986); *United States v. Swanson,* 618 F.Supp. 1231, 1239 (E.D.Mich.1985). Each of the cases, however, primarily involved challenges to the NHSC program's default provisions, see discussion below, and did not involve challenges regarding modifications to the program's requirements.

ment to award benefits for any more than one year. And, as mentioned above, the fact that defendant may have been under strained financial conditions at the time does not require a finding that she was left with no alternative but to accept the new agreement.

Accordingly, defendant's argument for voiding the 1978–79 agreement on the ground of economic duress cannot be sustained.

### Integration of "Extrinsic" Documents and Substantial Performance

Defendant invokes the parol evidence rule to exclude all restrictions on deferment opportunities contained in the 1978 applicant information bulletin which are not explicitly incorporated into her NHSC scholarship agreement. She also seeks to exclude the same provisions plus additional documentation requirements contained in the Secretary's regulations on the ground that they were promulgated after her NHSC agreement was executed. Although not explicitly so argued, defendant also urges in the alternative that summary judgment is inappropriate since the provisions governing deferment are ambiguous. Finally, defendant argues that she has in fact substantially complied with the deferment requirements and that it is the Secretary who has failed to fulfill its obligations by not appointing defendant to a position in the NHSC.

■ Defendant's attempt to exclude the deferment requirements contained in both the 1978 information bulletin and the program's regulations is based on the same contractual view of her obligations that she has pressed with respect to the other aspects of her defense. For the reasons expressed above, this approach is unavailing here as well.

Moreover, it should be noted that defendant admits that prior to signing the 1978–79 NHSC program agreement she received and read the March 1978 memorandum and information bulletin. The memorandum explicitly stated that participants who elected to participate in the NHSC program would be subject to all the provisions con-

tained in the bulletin. The bulletin, in turn, notified applicants that they would be subject to new federal regulations but that these regulations had not yet been made final or published.

With respect to the documentation requirements, defendant admits that the notice of approval of a one-year deferment dated May 1, 1980, required her to document her postgraduate training status within thirty days of graduation. In addition, defendant does not deny that the May 28, 1980 letter permitting defendant to pursue a surgery internship imposed an additional requirement that she submit a signed statement from the internship's director that her curriculum would include at least three months of primary care rotations.

■ In the event these provisions are not excluded, defendant also argues that summary judgment is inappropriate since the deferment requirements set forth in the bulletin are ambiguous. While an ambiguity in contractual obligations is a sufficient ground for denying summary judgment, *See, e.g., Long Island Airports Limousine Service Corp. v. Playboy-Elsinore Assoc.,* 739 F.2d 101 (2d Cir.1984), on the present facts any alleged ambiguity contained in the information bulletin is unavailing to defendant's cause.

Plaintiff argues that the terms of the bulletin are ambiguous because, while they state that some form of primary care internship is required, they also merely admonish that "participants who complete non-primary care residencies ... will be used as general medical practitioners with limited opportunity to practice their specialties." The bulletin further states that "[p]articipants should consider postponing non-primary care residency training until they have completed the Scholarship Program service obligation."

The Court agrees with defendant that these terms seem to leave open the possibility of a non-primary care internship. However, it seems that the Secretary was also aware of this ambiguity since, by letter dated May 28, 1980, he granted defendant a deferment to pursue a general surgery

internship, provided that her program include a three-month primary care rotation. Defendant raises no claim that this change in the Secretary's position was in any way ambiguous. Nor does she argue that the condition imposing a three-month primary care rotation prevented her from pursuing the type of internship she had originally anticipated would be available to her.

In any event, whether or not defendant is found to have breached the deferment requirements by pursuing an unauthorized internship, it is undisputed that defendant has also breached her agreement by failing to submit either documentation of her training status or the required statement from the director of her internship. Despite warnings from NHSC officials on both November 14, 1980, and January 5, 1981, that defendant's failure to submit the necessary documentation would result in her default (the latter notice actually declared defendant in default), defendant inexplicably failed to comply. Accordingly, on these grounds, plaintiff was within its right to declare defendant in default.

■ Finally, for these same reasons, defendant's unsubstantiated claim that she has, in fact, completed a surgery/internal medicine internship and informed plaintiff of this by telephone in the summer of 1981 cannot withstand plaintiff's summary judgment motion. First, defendant's mere allegation that she has completed an authorized program, without offering any documentary support, cannot, by itself, raise a genuine issue of fact sufficient to avoid summary judgment. In any event, it is undisputed that defendant was already declared in default some six or seven months prior to this alleged phone conversation. At that point, plaintiff had no further obligation to provide defendant with an opportunity to fulfill her service obligation. Therefore, contrary to defendant's contention, plaintiff cannot be said to have breached its own obligation by failing to appoint defendant to a position.

### Enforceability of the Liquidated Damage Clause

Defendant's final contention is that the treble damage provision contained in the statute and her agreement with the NHSC is void and unenforceable as a penalty. Other scholarship recipients in defendant's position have raised this same objection, and in every instance the court has held the treble damage provision to be enforceable. *See United States v. Pedovan, M.D.*, 656 F.Supp. 121 (E.D.Pa.1986); *United States v. Bills*, 639 F.Supp. 825 (D.N.J.1986); *United States v. Hayes*, 633 F.Supp. 1183, 1185 (M.D.N.C.1986); *United States v. Haithco*, 644 F.Supp. 63 (W.D.Mich.1986); *United States v. Swanson*, 618 F.Supp. 1231 (E.D.Mich.1985).

■ The general rule for determining the enforceability of a liquidated damage clause in a federal contract requires a finding by the court that the provision is a "fair and reasonable attempt to fix just compensation for anticipated loss cause by a breach of contract." *Priebe & Sons, Inc. v. United States*, 332 U.S. 407, 411–12, 68 S.Ct. 123, 126, 92 L.Ed. 32 (1947). The provision is to be judged as of the time the contract was formed. *Id.*

■ Contrary to defendant's contention, the actual damages in this case are not limited solely to the monies given by the government to finance her education. The undisputed facts show that the defendant failed to submit the required documentation regarding her internship program—either before she was declared in default or in opposition to the present motion—which would have established that defendant was in fact enrolled in an internship that met the statutory and regulatory requirements. Her failure to do so constituted a material breach of her obligation, and, as a result, the government has been deprived of two years of her services as a physician in a medically underserved area of this country.

The Court finds, as have the others who have been confronted with this issue, that the value of these lost services is difficult if not impossible to determine. *See, e.g., Swanson, supra*, 618 F.Supp. at 1243. Thus, although cognizant of the onerous burden placed on the defendant, the Court cannot conclude that the provision bears no

relation to the actual damages suffered by the government or that they were not a fair and reasonable attempt to fix just compensation in the event of breach. *Id; Pedovan, supra,* 656 F.Supp. 121.

### CONCLUSION

For the reasons stated above, plaintiff's motion for summary judgment is granted. Plaintiff shall recover from defendant the sum of $109,363.79, plus interest from October 27, 1986, calculated in accordance with the terms of defendant's respective scholarship awards.

The Clerk is directed to enter judgment in favor of plaintiff in the sum of $109,-363.79, plus interest from October 27, 1986, and to mail a copy of the within to all parties.

SO ORDERED.