**ALUMINUM COMPANY OF AMERICA, General Motors Corporation, Minnesota Mining and Manufacturing Company, and Union Carbide Corporation, Plaintiffs,**

v.

**FEDERAL TRADE COMMISSION, Defendant.**

**No. 83 Civ. 5093(ADS).**

United States District Court, S.D. New York.

May 8, 1984.

Weil, Gotshal & Manges, New York City, for plaintiffs; Salem M. Katsh, Helene D. Jaffe, New York City of counsel.

F.T.C., Washington, D.C., F.T.C., New York Regional Office, New York City, for defendant; John H. Carley, Howard E. Shapiro, Joanne L. Levine, Washington, D.C., Salvatore F. Sangiorgi, New York City, of counsel.

### MEMORANDUM OPINION AND ORDER

SOFAER, District Judge:

The plaintiffs, four of America's largest manufacturing companies, have sued the Federal Trade Commission ("FTC") to prevent disclosure of their "line of business" ("LB") financial reports to persons who are not regular, fulltime FTC employees. They have moved for summary judgment on the ground that the FTC's action in allowing access to research consultants violates sections 6(h) and 10 of the FTC Act ("Act"), 15 U.S.C. §§ 46(h), 50, as well as the confidentiality provision of the Criminal Code, 18 U.S.C. § 1905. Plaintiffs also contend that by allowing such access the FTC has authorized conduct in violation of its own rules of ethics, and that the FTC's rule interpreting section 6(h) of the Act was adopted in

violation of the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 706. Plaintiffs seek an order requiring the FTC to modify its confidentiality rules governing LB reports and enjoining the FTC from any further disclosures of plaintiffs' individual company LB data to persons other than officers or regular employees of the FTC.

The FTC has also moved for summary judgment, asserting that its research consultants are "special employees," who qualify for access to individual company LB data under section 6(h) as a matter of law. It denies any violation of applicable statutes, regulations, or rules of ethics, and claims its adoption of the LB confidentiality rules was procedurally valid. The FTC's arguments are correct and, no material issue of fact being in dispute, judgment must be entered in its behalf.

### I. *The LB Program and Access to LB Data.*

The LB program is a major statistical survey designed to collect financial data from large manufacturing companies on sales, intracorporate transfers, costs, profits, and assets; to break down these data by specified lines of business, or product categories; and to aggregate and publish these data in a manner that does not reveal the individual data of constituent companies. The FTC hopes to use individual and aggregated LB data to identify areas of the economy in which profits are relatively high or low and to assess relationships between market structure and performance. Relevant findings could thereafter be used to target particular markets for industry-wide investigations into potential antitrust violations or unfair trade practices. *See Appeal of FTC Line of Business Report Litigation,* 595 F.2d 685, 691 (D.C.Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978).

The FTC began developing the LB program in 1970. After extended consideration and revisions, an LB form was approved by the General Accounting Office. Subsequently, the FTC ordered 450 of the nation's largest domestic manufacturing concerns to file LB reports disclosing certain financial data for 1974. Motions to quash the FTC orders were filed by 150 companies. *Appeal of FTC Line of Business Report Litigation,* 595 F.2d at 692. The FTC sued successfully in the United States District Court for the District of Columbia to compel these corporations to file the LB data. *In re FTC Line of Business Report Litigation,* 432 F.Supp. 291 (D.C.1977), *aff'd,* 595 F.2d 685 (D.C.Cir.), *cert. denied,* 439 U.S. 958, 99 S.Ct. 362, 58 L.Ed.2d 351 (1978). Plaintiffs have all filed the reports required by the FTC for 1974.

The need to assure confidential treatment for individual company LB data led Congress to enact special riders to the legislation appropriating funds for the FTC for the fiscal years 1975 through 1977. The riders provided that:

No part of these funds may be used to pay the salary of *any employee, including Commissioners,* of the Federal Trade Commission who—

(1) uses the information provided in the line-of-business program for any purpose other than statistical purposes. Such information for carrying out specific law enforcement responsibilities of the Federal Trade Commission shall be obtained under existing practices and procedures or as changed by law; or

(2) makes any publication whereby the line-of-business data furnished by a particular establishment or individual can be identified; or

(3) *permits anyone other than sworn officers and employees of the Federal Trade Commission* to examine the line-of-business reports from individual firms.

88 Stat. 1822 (1975); 89 Stat. 611 (1976); 90 Stat. 977 (1977) (emphasis added).

The FTC promulgated rules identical to the riders, interpreting section 3 of the rider to prohibit disclosure of the LB reports from individual firms "to any person outside the FTC including Congress, parties in court proceedings, governmental agencies, and members of the public." 40 Fed.Reg. 21542 (1975), 41 Fed.Reg. 28041 (1976), 41 Fed.Reg. 31703 (1976).

In February 1978, anticipating the availability of LB data for 1974, the FTC's Bureau of Economics formed a committee to develop research application procedures. William F. Long was appointed chairman. From the beginning of the committee's deliberations, FTC officials assumed that "special employees" would be used to perform a substantial amount of research work with the LB data. FTC officials believed even then that using special employees to study LB data was permissible under the riders and confidentiality rules. Long Declaration ¶ 6.

On October 16, 1979, because Congress had not enacted a special LB confidentiality rider to the FTC's 1978 fiscal appropriations legislation which would have applied to the 1977 data, the FTC published proposed confidentiality rules to govern 1977 LB reports. 44 Fed.Reg. 59552, 59554–55 (1979). The rules included the following statement: "No employee (including a special employee) shall be assigned to this [Division of Financial Statistics] unit unless he certifies that, during such assignment and after its termination for any reason, he will abide by the limitations in these rules." *Id.* at 59554. The FTC extended the deadline for compliance with the 1977 LB orders until 30 days following the issuance of final rules. In January 1980 the FTC began to allow access to individual company LB data to outside researchers acting as "special employees." Only then was the first complete set of LB data ready for use, due to litigation delays in obtaining the LB reports.

In March 1980 the FTC again published proposed 1977 LB Rules for comment. It omitted the October 1979 reference to special employees and adopted the language of the appropriations riders. 45 Fed.Reg. 18946, 18947–48 (1980). On May 28, 1980, the FTC Improvement Act was enacted into law, providing in relevant part:

No officer or employee of the Commission or any Commissioner may publish or disclose information to the public, or to any Federal agency, whereby any line-of-business data furnished by a particular establishment or individual can be identified. No one other than designated sworn officers and employees of the Commission may examine the line-of-business reports from individual firms, and information provided in the line-of-business program administered by the Commission shall be used only for statistical purposes. Information for carrying out specific law enforcement responsibilities of the Commission shall be obtained under practices and procedures in effect on May 28, 1980, or as changed by law.

15 U.S.C. § 46(h). Congress intended this statute to give the companies submitting LB reports the same confidentiality protections as the appropriations riders had provided. S.Rep. No. 96–500, 96th Cong., 1st Sess., *reprinted in* 1980 U.S.Code Cong. & Ad.News 1102, 1114. Congress did not indicate, however, whether the term "employees" included "special employees."

On August 27, 1980, the FTC published "final" confidentiality rules for the 1977 LB reports which reinserted the "special employee" phrase. These rules were published without further public notice. 45 Fed.Reg. 57230, 57231–32 (1980). The "final" 1980 rules were superseded in December 1981 by final uniform LB confidentiality rules governing LB reports for each year from 1974 to 1977. The 1981 rules currently in effect are virtually identical to the August 1980 rules and include the reference to special employees. The December 1981 rules became effective after a sixteen-month comment period, during which plaintiffs and others could and did comment on the inclusion of special employees as "designated sworn officers and employees" entitled to examine LB data. 46 Fed.Reg. 62703, 62706–08 (1981).

On September 26, 1980, plaintiffs filed a motion with the FTC to quash its effort to collect LB data for 1977 on the ground that the final confidentiality rules had been promulgated in violation of the APA and section 6(h) of the Act. On February 14, 1983, the FTC denied plaintiffs' motion as untimely, finding as well that FTC rules and governing statutes would provide adequate

protection for the LB reports. The FTC determined that "the mere fact that special employees had access to individual companies' LB data in the course of their employment is not a violation, because such persons are legally designated and sworn officers of the FTC." Katsh Exhibit 30.

In 1981 the FTC suspended the collection of LB data for years after 1977 pending a cost-benefit analysis. The Commission has made no attempt to collect any LB data for years after 1977, and on April 11, 1984, the FTC voted against collecting further LB data. The research and publication functions of the program continue, however, Long Decl. ¶¶ 4, 5, and the FTC has announced its intention to continue to make LB data available to special employees for research.

The FTC has already allowed various outside researchers, hired as special employees, to examine individual LB reports for the years 1974 through 1976 under FTC supervision. The researchers have used the data pursuant to a "Line of Business Research Confidentiality Agreement" ("LB Agreement") adopted in January 1980. Almost all the researchers are scholars well known in their fields. Some occasionally do consulting work for law firms, corporations, or other government agencies. Approximately twenty to thirty research papers have been prepared or are currently being prepared by these outside researchers based on information acquired in the LB program.

II. *The Meaning of "Employee" in Section 6(h) of the Act.*

■ The primary issue in this case is whether the FTC's disclosure of individual company LB data to various outside researchers violates the mandate in section 6(h) that "no one other than designated sworn ... employees may examine the LB reports from individual firms." 15 U.S.C. § 46(h). Plaintiffs contend that the statute refers only to regular FTC employees and no one else. The FTC maintains that the words employees in the statute encompasses non-regular, special government employees, so long as they are individually designated, sworn to confidentiality, and properly supervised.

The starting point for interpreting the statute is its language. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The interpretation that an agency gives to its enabling statute deserves great deference. *FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 37–39, 102 S.Ct. 38, 44–46, 70 L.Ed.2d 23 (1981); *Udall v. Tallman,* 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). So long as "the Commission's construction was 'sufficiently reasonable,' ... it is not necessary for the court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *FEC v. Democratic Senatorial Campaign Committee,* 454 U.S. at 39, 102 S.Ct. at 46 (quoting *Train v. Natural Resources Defense Council,* 421 U.S. 60, 75, 95 S.Ct. 1470, 1479, 43 L.Ed.2d 731 (1975)). Plaintiffs provide no reason to disregard the FTC's interpretation of "employees."

Before the 1980 FTC Improvement Act, individual companies' LB data had been protected by appropriations riders for fiscal years 1974 through 1977. The riders expired in September 1977, after which Congress did not reimpose them. Plaintiffs contend that, as the statute is virtually identical to and was meant to codify provisions that Congress included in the riders, the statute obviously excludes anyone other than regular FTC employees. But this begs the question of what "employees" meant in the riders. While the legislative history of the riders reveals that they embodied Congress' purpose to provide the LB reports with comprehensive confidentiality, it includes nothing specific on whether Congress thought confidentiality would be compromised in any significant way by permitting "special employees" access.

Plaintiffs also argue that Congress has used the term "other authorized representative" in several other statutes when it

intended to authorize disclosure of confidential data beyond officers and regular employees. *See, e.g.,* 21 U.S.C. §§ 458(a), 1037(e); 26 U.S.C. § 6103(g)(2). Citing as an example Congress' 1976 amendment of the Census Act to allow temporary staff to use confidential data, *see* 13 U.S.C. §§ 9(a)(3), 23(c), they urge that the absence of "other authorized representative" from section 6(h) of the Act indicates that Congress did not mean to authorize access to special employees. This argument would read into the FTC Act a restriction not suggested by the language itself, a process that cannot permissibly be accomplished without reference to the legislature's purpose. "Special employees" comprise but a subset of the broader class of the "designated sworn ... employees" to whom the statute permits access. Absent contrary indications in the legislative history, courts should not lightly read limitations into the statutory language chosen by Congress. *Cf. United States v. Turkette,* 452 U.S. 576, 580–81, 101 S.Ct. 2524, 2527–2528, 69 L.Ed.2d 246 (1981) (construing 18 U.S.C. § 1962(a) (RICO)). Certainly, Congress' decision to amend a different statute, the Census Act, in order to "clarify existing practices" provides no warrant for introducing such a limitation here. S.Rep. No. 94–1256, 94th Cong., 2d Sess., *reprinted in* 1976 U.S.Code Cong. & Ad.News 5463, 5469.

Access for "special employees" to LB data is consistent with the purposes of section 6(h). The FTC enforces laws against anticompetitive business activities and unfair or deceptive trade practices. 15 U.S.C. §§ 21, 45(b). The FTC is also responsible for providing information affecting economic issues, particularly those affecting antitrust policy and economic regulation. *Id.* § 46. To fulfill its economic reporting mission, the FTC is empowered to obtain financial information for reports to Congress, and "to make public from time to time such portions of the information obtained by it ... as are in the public interest." *Id.* § 46(f). The FTC and its staff have issued or sponsored many reports and studies over the years, and the LB program was initiated as part of this reporting mission.

The purpose of section 6(h) was to prevent the release of "competitively sensitive" information in a manner by which the particular establishment or individual furnishing LB data could be identified. S.Rep. No. 500, 96th Cong., 1st Sess. 12, *reprinted in* 1980 U.S.Code Cong. & Ad.News 1102, 1114 (1980). This purpose suggests that the word "employees" should be construed to include only persons sufficiently reliable and under FTC control so that the data are properly protected. The record amply supports the FTC's contention that special employees are persons to whom access to LB data may properly be granted. Special employees are used throughout the FTC's Bureau of Economics, not only in the LB program. Bond Declaration ¶¶ 6–9. They bring special skills of research and analysis to the FTC which aid the agency in its difficult and important work. Often these are individuals unwilling to enter fulltime government employment for extended periods because they are engaged in other important activities. Furthermore, the FTC could not practically retain as fulltime staff members the complete range of experts in the numerous subcategories of economics that are involved in developing studies and reports from the LB data. Special employees greatly expand the number of topics that can be studied by the FTC, and thus the usefulness of LB data.

Special employees are hired and supervised in a careful manner to ensure confidentiality of the data to which they are given access. They sign an LB Confidentiality Agreement in which they agree to abide by all LB confidentiality rules and to submit Quarterly Financial Reports. The agreement requires the researcher to acknowledge that individual company LB data may not be disclosed outside the Commission; that LB data are limited within the FTC to the LB program; and that *no* data may be retained after termination of FTC employment. The agreement also specifies that any proposed publication will not disclose individual company LB data.

Long Decl. ¶¶ 60–61. Researchers must in addition sign a Consultant Confidentiality and Non-Disclosure Agreement, and are subject to FTC confidentiality rules and several statutory restraints. For example, 15 U.S.C. § 50 makes any unauthorized disclosure of information obtained by the FTC, by any officer or employee of the FTC, a misdemeanor, and 18 U.S.C. § 1905 makes a government employee's unauthorized disclosure of confidential business information a misdemeanor punishable by fine and imprisonment. Finally, the FTC periodically reviews the research projects and outside employment situations of special employees to ensure that conflicts of interest or other problems are not developing.

In the fact of this evidence of reasonable need for the services of special employees, and of the substantial protections afforded the data they use, plaintiffs present only theoretical difficulties and dangers. They cite not a single instance of abuse or improper conduct by a special employee, and do not even attempt to demonstrate any reason to believe these employees will violate confidentiality rules any more than permanent employees engaged in the same types of work. These speculative fears of unauthorized release of confidential material do not warrant a narrow reading of the statute. The rules, sanctions, and procedures developed by the FTC are adequate to protect against impermissible disclosure. *Cf. Bunker Hill Company Lead and Zinc Smelter v. Environmental Protection Agency*, 658 F.2d 1280, 1284 (9th Cir.1981) (construing "authorized representative" in 42 U.S.C. § 7414(a)(2)); *FTC v. Karr*, 1978 CCH Trade Cas. ¶ 61932 (D.D.C.1978). Professionals working in the LB program have strong incentive to refrain from illegally using the data, and few if any would risk the stigma and damage to their careers that improper disclosures could cause.

### III. *Status of Outside Researchers as Special Employees.*

■ Plaintiffs contend that, even if the statute could be construed as authorizing "special employees" to have access to individual company LB data, the types of individuals to whom the FTC has given and continues to give access to the data cannot reasonably be deemed special employees. According to plaintiffs, a special employee must meet the statutory definition found in 5 U.S.C. § 2105, which requires an employee to be "subject to ... supervision ... while engaged in the performance of the duties of his position."

Plaintiffs have produced no support for their contentions that a temporary employee hired under 5 U.S.C. § 3109 or a special government employee hired under section 202(a) must meet the statutory definition of employee in section 2105. The cases upon which plaintiffs rely state only that the supervision requirement must be satisfied for an individual to qualify as a regular federal employee. *See National Treasury Employees Union v. Reagan*, 663 F.2d 239, 246 (D.C.Cir.1981); *Baker v. United States*, 614 F.2d 263, 266, 222 Ct.Cl. 263 (1980); *Lodge 1858, American Federation of Government Employees v. Webb*, 580 F.2d 496, 504 (D.C.Cir.), *cert. denied*, 439 U.S. 927, 99 S.Ct. 311, 58 L.Ed.2d 319 (1978). They do not address whether temporary or special employees must meet the same strict supervision test. Nor do the legislative histories of these statutes reveal a congressional intent consistent with plaintiffs' contentions. Both 5 U.S.C. § 3109 and 18 U.S.C. § 202(a) were enacted because Congress recognized the government's need to hire specialists for short-term projects. Congress wanted to facilitate the use of employee-consultants by relieving them from restrictions inappropriate to their role and status, including close supervision and restrictions on outside employment. *See* 28 Fed.Reg. 985 (1963); *see generally Boyle v. United States*, 309 F.2d 399, 159 Ct.Cl. 230 (1962).

Moreover, plaintiffs have failed to show why "employee" for the purpose of section 6(h) of the Act, or in any other confidentiality statute, must be construed identically to "employee" in section 2105, which expressly limits its definition to "the purposes of

this title," including such subjects as civil service pay, leave, and retirement. The purposes of confidentiality and civil service provisions differ, and might best be accomodated by different, but non-conflicting definitions of "employee." Even within the same statute, Congress sometimes chooses to imbue identical terms with different meanings when it employs the term to different purposes. *See Steadman v. SEC*, 450 U.S. 91, 100, 101 S.Ct. 999, 1007, 67 L.Ed.2d 69 (1980).

In any event, were section 2105 deemed to control section 6(h), its supervision criteria are met here. The degree of supervision to which special employees are subject satisfies the purposes of section 6(h) and section 2105, given the nature of the researchers' employment. Researchers are supervised to prevent conflicts of interest. Research topics must be accepted by an FTC committee which reviews the relevance of the topic and the adequacy of the proposed research procedures. Papers written by special employees are reviewed and criticized on substantive aspects by other FTC economists. An unsatisfactory paper would not be forwarded for clearance, nor may a researcher prepare a second related paper based on LB data without approval. Long Supp.Decl. ¶¶ 3, 8. Before any paper based on LB data may be disclosed outside the FTC, the manager of the LB program must review it and certify that it does not identify individual company data. The FTC Chairman and other officials must approve its release. Given the inherently independent nature of research and writing, these forms of oversight and control are adequate to meet the supervision test of 5 U.S.C. § 2105(a)(3).

## IV. *Alleged Violations of Ethical Rules.*

■ The FTC's Standards of Conduct provide in part that employees, including "special employees," may not

engage in teaching, lecturing, or writing ... that is dependent on information obtained as a result of his Government employment, except when that information has been made available to the general public ... or when the Chairman gives written authorization for the use of nonpublic information on the basis that the use is in the public interest.

16 C.F.R. §§ 5.12(c), 5.21 (1984). Plaintiffs allege that the FTC has violated this ethical rule by allowing the researchers to publish articles based on confidential LB data without the Chairman's affirmation that the data is being used in the public interest.

The LB Researcher Agreement states that any study not revealing individual company data, whether or not the FTC adopts the study as its own, is deemed by the Chairman to be in the public interest. This suggests to plaintiffs that studies are routinely or occasionally released without the Chairman's review. LB Program procedures belie this view, however. As noted, an unsound research paper would not be cleared for public dissemination, even if no individual data were revealed, and any paper released outside the FTC must be individually approved by the Commission Chairman. Long Supp.Decl. ¶ 3. Further, at the time the confidentiality agreement is signed, the special employees' research proposals have been received and approved. This effectively limits the research conducted to subjects and studies already determined to be in the public interest. Nothing in section 5.12(c) prevents the Chairman's public interest determination from being made before a proposed study has been written. Finally, the FTC decision not to publish a report does not necessarily indicate it believes the study is not in the public interest. The FTC does not itself normally publish studies or reports, and many staff studies published by the Bureau of Economics carry disclaimers indicating that they have not been adopted by the Commission. Bond Decl. ¶¶ 12–140.

■ Plaintiffs also contend that the FTC has violated its ethical rule mandating that, except as provided in section 5.12(e), a special employee may not "use inside information obtained as a result of his Government employment for private gain ... either by direct action on his part or by counsel, recommendation, or suggestion to another

person." *See* 16 C.F.R. § 5.23; *see also id.* §§ 5.10, 5.21 (prohibiting special employees, like all FTC employees, from doing anything that "might result in, or create the appearance of ... using public office for private gain"). They urge that researchers publish articles in scholarly journals for their private gain. The FTC reasonably rejects this construction. Publication of research in journals is not what the FTC meant by private gain in its regulations, Long Decl. ¶ 68, and the agency's construction of its own regulations is entitled to great weight, *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); *American Airlines, Inc. v. Secretary of Labor*, 578 F.2d 38, 39 (2d Cir.1978); *Tyson v. Maher*, 523 F.2d 972, 974 (2d Cir.1975). The publication of analyses based on LB data in journals is consistent with the purposes of the LB program, because it assures wide dissemination of economic learning. "Regular" employees of the Bureau of Economics are similarly encouraged and often expected to publish outside the Commission. Bond Decl. ¶ 15–16; Long Decl. ¶ 68.

█ Some of the outside researchers used by the FTC are scholars who, when not in the LB program, work as consultants for private law firms or companies, giving advice on matters which might from time to time involve some of the 450 LB responding companies. Plaintiffs assert that it is impossible for such individuals not to assimilate and use in connection with their outside employment, directly or indirectly, the individual LB data they have studied. Plaintiffs urge that, despite the researchers' oaths and good intentions not to disclose the data, "there is simply no way, in practice, for them not to use or appear to be using the information they have gleaned from their study of individual company LB reports in their various professional activities.... It is an inherent and unavoidable conflict of interest." Plaintiffs' Reply Memo at 29. The disclosure or use of data for private purposes would violate section 6(h) as use for a nonstatistical purpose.

Special employees are exempt from the conflict of interest regulations binding regular federal employees; they need not obtain clearance for private sector employment positions. 16 C.F.R. § 5.42 (1983). As noted earlier, the FTC and Congress found it necessary to relax this restriction to obtain and encourage the use of experts to do a broad range of work not readily or well done by regular FTC employees. The possibility of improper use of LB data therefore exists, but as discussed above the FTC has adopted procedures and rules reasonably calculated to guard against conflicts of interest. Researchers are screened before joining the program and throughout their FTC employment; and they are required by FTC rules to submit a statement of financial interests and employment which is reviewed by the Manager of the LB program and the FTC's Personnel Director, who must certify that no conflict of interest exists. 16 C.F.R. §§ 5.41, 5.42; Long Decl. ¶ 62. Once hired, each special employee is required to notify FTC staff of changes in his or her employment. 16 C.F.R. § 5.41(c). A researcher with outside consulting arrangements as to which individual company data might be relevant is precluded from seeing individual data from such companies. Long Decl. ¶ 62. Furthermore, researchers have worked in the program since 1980, and no evidence is presented that any one of them has used the individual company data for anything other than the LB studies. The reputation and integrity of the researchers being hired for this work is of great concern to the FTC, as they bear upon the credibility and potential utility of the LB program. Finally, the possibility of being "influenced" in some fashion by LB data is not confined to special employees. Full-time, part-time and temporary non-special employees similarly are exposed to LB data. Like special employees, nonspecial employees may also leave FTC employ and carry this "influence away with them." Def. Reply Memo at 8.

V. *Manner of Adopting Confidentiality Rules.*

Plaintiffs argue that the manner in which the FTC adopted rules authorizing

"special employees" to have access to individual company LB data violated the APA. They contend that the FTC's inclusion of the special employee provision in the August 1980 version of the 1977 confidentiality rules, after its omission from the interim version of the rules published in March 1980, effectively precluded meaningful comment on the provision. They conclude that the FTC's LB confidentiality rules should be revised to exclude special employees, and the FTC's action granting special employees access to LB data should be declared unlawful under section 706 of the APA.

■ The notice and comment procedure of section 553(b)(A) of the APA does not apply to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." The FTC rules allowing special employees access to the data are procedural, and thus not subject to notice and comment procedures prescribed by 5 U.S.C. § 553(b). Although the line between substance and procedure is notoriously difficult to draw, "courts have generally held that notice and comment is required if the rule makes a substantive impact on the rights and duties of the person subject to regulation." *Reynolds Metals Co. v. Rumsfeld*, 564 F.2d 663, 669 (4th Cir.1977), *cert. denied*, 435 U.S. 995, 98 S.Ct. 1646, 56 L.Ed.2d 84 (1978). If the rule has no such impact, it is exempt from statutory notice and comment requirements. *See Pickus v. United States Board of Parole*, 507 F.2d 1107, 1112 (D.C. Cir.1974); *Lewis-Mota v. Secretary of Labor*, 469 F.2d 478, 481 (2d Cir.1972). The FTC rule allowing special employees access to individual company LB data has no substantive impact on plaintiffs. They have no fewer rights nor greater obligations as a result of the rule, which enables the FTC more effectively to use LB data without measurably sacrificing confidentiality.

In *Appeal of FTC Line of Business Report Litigation*, the District of Columbia Circuit held that neither section 6(g) of the FTC Act, under the authority of which the FTC compelled production of the LB data,

nor the APA required the FTC to pursue rulemaking procedures before ordering LB reporting. 595 F.2d at 693–96. It found this holding to comport with the FTC's longstanding interpretation, to which it accorded the usual deference, that the procedural requirements of the two statutes did not apply when the FTC exercised its powers under section 6 to gather information or to investigate. *Id.* at 696 n. 51. If the FTC is not required to promulgate rules in order to compel companies to provide the information in the first place, it follows that it would also have no such obligation when establishing procedures to protect the confidentiality of that information. Here the FTC action had the sole effect of allowing special government employees access to individual company LB data under adequate agency supervision, and did not alter plaintiffs' rights or duties in any way.

Finally, even were the 1977 rules as adopted in 1980 procedurally defective, plaintiffs would not be entitled to relief because those rules are no longer in effect. The August 1980 rules were superseded in December 1981 by uniform LB confidentiality rules governing LB reports for all years. *See* 46 Fed.Reg. 62703–04, 62706 (1981). The uniform rules were preceded by a sixteen-month comment period during which plaintiffs and others could and did comment on the rules' reference to special employees. *See id.* at 62704, 62705; 45 Fed.Reg. at 57231–32 (1980).

The FTC's cross motion for summary judgment is granted. Plaintiffs' motion for summary judgment, requesting a declaration that the FTC's practices violate the LB confidentiality statute and an injunction to prevent the FTC from further disclosures of plaintiffs individual company LB data to "special employees," is denied. F.R.C.P. 56.

SO ORDERED.