GENERAL CARBON COMPANY, a DI-
VISION OF ST. MARY'S CARBON
COMPANY, a Corporation, Petitioner,

v.

OCCUPATIONAL SAFETY & HEALTH
REVIEW COMMISSION, and Secretary
of Labor, Respondents.

No. 87–1805.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 18, 1988.

Decided Nov. 8, 1988.

Stella L. Smetanka, with whom David B. White, Pittsburgh, Pa., was on the brief, for petitioner.

Barbara Werthmann, Atty., Dept. of Labor, with whom George R. Salem, Sol., Cynthia L. Attwood, Associate Sol., Ann Rosenthal, Atty., Dept. of Labor, Washington, D.C., were on the brief, for respondents.

John Shortall, Atty., Dept. of Labor, Washington, D.C., also entered an appearance for, Dept. of Labor.

Before WALD, Chief Judge and MIKVA and SENTELLE, Circuit Judges.

Opinion for the Court filed by Chief Judge WALD.

WALD, Chief Judge:

Petitioner General Carbon Company ("General Carbon" or "the company") seeks review of an order of the Occupational Safety and Health Review Commission ("OSHRC" or "the Commission"). That order upheld the Administrative Law Judge's ("ALJ") determination that General Carbon, by its failure to attach a warning label to containers of electrical brushes, had violated one of the Hazard Communication Standards ("HCS") promulgated by the Secretary of Labor. We conclude that OSHRC's action was proper. The petition is accordingly dismissed.

## I. FACTS

### A. *The Hazard Communication Standards*

The Occupational Safety and Health Act of 1970, 29 U.S.C. § 651 *et seq.* ("OSHA" or "the Act"), was a congressional response to widespread hazards in the nation's workplaces. The Act's stated purpose is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). Primary responsibility for the implementation of the Act rests with the Secretary of Labor, whose duties include both the promulgation of health and safety standards, *see* 29 U.S.C. § 655, and the issuance of citations to violators, *see* 29 U.S.C. § 658.[1] If an employer contests the

---

**1.** The Secretary has delegated her responsibility under the Act to the Assistant Secretary for Occupational Safety and Health, who heads the Occupational Safety and Health Administration.

citation, the OSHRC adjudicates the dispute. *See* 29 U.S.C. § 659(c). The Commission is an independent tribunal whose members are appointed by the President subject to Senate confirmation, *see* 29 U.S. C. § 661(a). "The Commission's function is to act as a neutral arbiter and determine whether the Secretary's citations should be enforced"; it "was created to avoid giving the Secretary both prosecutorial and adjudicatory powers." *Cuyahoga Valley Railway Company v. United Transportation Union,* 474 U.S. 3, 7, 106 S.Ct. 286, 288, 88 L.Ed.2d 2 (1985). Its adjudication is performed in the first instance by an ALJ, *see* 29 U.S.C. § 661(j); a party adversely affected or aggrieved by the ALJ's decision may seek discretionary review by the Commission. *See* 29 C.F.R. § 2200.91. If no member of the Commission directs review within thirty days after the docketing of the ALJ's report, the ALJ's decision becomes a final order of the Commission. *See* 29 C.F.R. § 2200.90(d). Judicial review of the Commission's decision is available, but the Act expressly provides that "[n]o objection that has not been urged before the Commission shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." 29 U.S.C. § 660(a).

OSHA itself recognized the importance of providing workers with full information regarding any workplace dangers to which they might be exposed. Section 6(b)(7) of the Act, 29 U.S.C. § 655(b)(7), provides that "[a]ny standard promulgated under this subsection shall prescribe the use of labels or other appropriate forms of warning as are necessary to insure that employees are apprised of all hazards to which they are exposed, relevant symptoms and appropriate emergency treatment, and proper conditions and precautions of safe use or expo-

sure." For several years after the passage of the Act, however, the Secretary failed to promulgate standards requiring the dissemination of relevant information. In 1977, a House committee chided the Department for its failure to promulgate such standards: "The Department of Labor should exercise its power under the Occupational Safety and Health Act to insure that employers and workers can and will know what kinds of toxic dangers are present in the Nation's workplaces." House Committee on Government Operations, Failure to Meet Commitments Made in the Occupational Safety and Health Act, H.R.Rep. 710, 95th Cong., 1st Sess. 15 (1977). In 1983, after a lengthy rulemaking proceeding, the Secretary promulgated the Hazard Communication Standards. *See* 48 Fed.Reg. 53,280 *et seq.* (1983).

The HCS require not only that a manufacturer[2] inform its own employees of workplace dangers; the standards also compel manufacturers to furnish information to "downstream" employers and workers, so that employees further along the chain of commerce will be apprised of the hazards they face in working with manufactured products. In promulgating the HCS, the agency envisioned an informational program consisting of three interrelated parts. First, potentially dangerous substances are to be labeled so as to alert downstream employees of possible risks. Second, the manufacturer is to provide downstream employers with a material safety data sheet ("MSDS"); the MSDS contains more detailed information concerning potential hazards and is to be made available to downstream employees. Finally, it is expected that downstream employers, in training their own workers, will more fully explain the hazards to which they may be subjected.[3]

We use the terms "Secretary," "agency," and "Department" interchangeably.

2. The original standards applied only to manufacturing industries. In August 1987, the Secretary extended the HCS requirements to all industries covered by the Act. *See* 52 Fed.Reg. 31,852 (1987). Since General Carbon is a manufacturing company, it was not affected by the expansion of the standards.

3. A downstream employer, not the manufacturer, is in the best position to know how a potentially hazardous product will be used by downstream workers. Employee training therefore supplements the labels and MSDS by explaining the precise risks to which particular workers will be subjected.

The Hazard Communication Standards impose comprehensive disclosure requirements on chemical manufacturers. The standards require that "[t]he chemical manufacturer, importer, or distributor shall ensure that each container of hazardous chemicals leaving the workplace is labeled, tagged or marked with the following information: (i) Identity of the hazardous chemical(s); (ii) Appropriate hazard warnings; and (iii) Name and address of the chemical manufacturer, importer, or other responsible party." 29 C.F.R. § 1910.1200(f)(1). A container is "any bag, barrel, bottle, box, can, cylinder, drum, reaction vessel, storage tank, or the like that contains a hazardous chemical." 29 C.F.R. § 1910.1200(c). A hazardous chemical is "any chemical which is a physical hazard or a health hazard." *Id.* And a health hazard is defined as "a chemical for which there is statistically significant evidence based on at least one study conducted in accordance with established scientific principles that acute or chronic health effects may occur in exposed employees." *Id.* The labeling requirements do not apply to "articles," *see* 29 C.F.R. § 1910.1200(b)(5)(iv); an article is defined as "a manufactured item: (i) Which is formed to a specific shape or design during manufacture; (ii) which has end use function(s) dependent in whole or in part upon its shape or design during end use; and (iii) which does not release, or otherwise result in exposure to, a hazardous chemical under normal conditions of use." 29 C.F.R. § 1910.1200(c). The Secretary has indicated that a product may qualify for the articles exemption if it releases only "a few molecules or a trace amount" of a hazardous chemical. *See* 52 Fed.Reg. 31,-865 (1987).

B.  *The Background of This Petition*

This case involves electrical brushes manufactured by petitioner General Carbon Company. These brushes, which are made predominantly of copper and graphite, are manufactured at General Carbon's plant in Sandwich, Illinois. They are shipped approximately 650 miles to a Delco Products plant in Rochester, New York, where two Delco employees insert the brushes into brush holders for use in electric windshield wiper motors. During this process, the two Delco employees are exposed to small quantities of copper and graphite dust, both on their hands and in the atmosphere.

Pursuant to an industrial hygiene inspection of the Illinois plant, General Carbon was cited for its failure to affix labels to containers of electrical brushes.[4] The Secretary proposed that the label should identify the chemicals copper and graphite and should include the following warning: "Dust may cause metal fume fever when inhaled or eye and mucous membrane irritation. Long-term exposure may lead to blood disorders, lung, kidney and liver damage." Joint Appendix ("J.A.") 42a. That language had been drafted by Mr. John A. Rizzo, an industrial hygienist employed by the agency. Transcript of Proceedings Before ALJ ("Tr.") 43–44.

General Carbon contested the citation. The company conceded that copper and graphite are hazardous chemicals within the meaning of the HCS. J.A. 18a. The company relied primarily on the contention that the HCS labeling requirements should not apply to its brushes since the Delco employees would be exposed to concentrations of copper and graphite far below the Permissible Exposure Limits ("PELs") for these chemicals and thus would face no actual danger.[5] The Secretary did not dispute the company's claim that exposure levels in the Delco plant would be low, nor did the agency present any evidence indicating that Delco employees would actually be at risk. The Secretary's position was

---

4.  The inspector's citation included seven items, five of which were not contested by the company. *See* J.A. 13a. At issue here are Items 1(c) and 1(d) of the citation. Item 1(c) alleged that the company had failed to mark the containers with the names of the chemicals therein. *See* 29 C.F.R. § 1910.1200(f)(1)(i). Item 1(d) alleged that the company had failed to mark the containers with an appropriate hazard warning. *See* 29 C.F.R. § 1910.1200(f)(1)(ii).

5.  Various studies performed by the company indicated exposure levels of 0.67–1.6% of the PEL for copper dust, and 3.8–6.8% of the PEL for graphite dust. *See* J.A. 28a–34a.

that evidence as to exposure levels within the Delco plant was simply irrelevant: the labeling requirement applied to all containers of hazardous chemicals shipped downstream and was in no way contingent on anticipated conditions at a particular downstream site. Mr. Rizzo, in fact, testified that he had never been to the Delco plant and had no way of knowing in what way the brushes would be used. Tr. 50.

The ALJ affirmed the citations and characterized them as other-than-serious. The ALJ accepted the Secretary's argument that "the HCS is applicable and enforceable without proof of the existence of a significant risk of harm in each individual case." J.A. 53a. The ALJ also held that the brushes could not be exempted as "articles," see J.A. 43a–46a, and that the violation could not properly be characterized as de minimis, see J.A. 56a–57a. General Carbon petitioned the OSHRC for discretionary review, see J.A. 61a; no member of the Commission directed review, and on November 9, 1987 the decision of the ALJ became a final order of the Commission. J.A. 71a. This appeal followed.

## II. DISCUSSION

Petitioner advances five distinct arguments in its petition for review: (1) the HCS do not require labeling of a product which has a unique downstream use and does not impose a significant risk of harm to any employee; (2) General Carbon's brushes are articles and therefore exempt from the labeling requirements; (3) the company's brushes are mixtures and thus exempt from the requirements; (4) the warning required by the agency was not "appropriate" because it overstated the risks to which the Delco employees would be subjected; and (5) the violation, if any, was de minimis rather than other-than-serious. We will consider each of these arguments in turn.

■ We note as an initial matter that petitioner, in asserting that the agency has misconstrued its own standards, has assumed a heavy burden. An agency's interpretation of its own regulations will be accepted unless it is plainly wrong. Unit-

ed States v. Larionoff, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977); Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965) ("When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order"). This court has previously noted "the high level of deference to be afforded an agency on review when the issue turns on the interpretation of the agency's own prior proclamations." Wichita and Affiliated Tribes of Oklahoma v. Hodel, 788 F.2d 765, 778 (D.C.Cir.1986).

### A. May a Labeling Requirement Be Imposed Absent Any Evidence of Significant Risk to Particular Workers?

General Carbon relies principally on the contention that the HCS labeling requirements do not apply to a product which has a unique downstream use and does not pose a significant risk of harm to any downstream worker. General Carbon does not rely on the wording of the standard, nor does it support its position by reference to the Secretary's contemporaneous interpretive statement. Instead, the company argues that the Secretary's interpretation of the standard cannot be correct because a labeling requirement which applied without regard to the degree of risk experienced by particular workers would be irrational and would violate the Act. The agency's reading of the HCS, however, is supported both by the plain language of the standard and by the Preamble issued at the time of promulgation. The Secretary's interpretation of the standard is in our view not merely reasonable, but is the only plausible reading of the rule.

■ The issue here, we emphasize, is limited to the reasonableness of the Secretary's interpretation of the HCS; no challenge has been made to the validity of the standards themselves. The law in this circuit clearly holds that the validity of standards promulgated by the Secretary under the OSHA may be contested in an enforcement proceeding. See Simplex Time Recorder Co. v. Secretary of Labor, 766 F.2d 575, 582–83 n. 2 (D.C.Cir.1985). At oral

argument, however, petitioner's counsel stated that the company's challenge is solely to the agency's enforcement of the standards.[6] Though the validity of the HCS might have been put at issue in this proceeding, the company has made no such challenge, and we therefore do not consider the question here.

█ The standard requires "that each container of hazardous chemicals leaving the workplace" must be marked with an "appropriate" label. 29 C.F.R. § 1910.1200(f)(1). The petitioner concedes, as we believe it must, that copper and graphite are "hazardous chemicals" within the meaning of 29 C.F.R. § 1910.1200(c).[7] The company contends, however, that its brushes are not hazardous chemicals because, given the downstream uses of these products, they will not in fact pose a hazard to the particular workers who use them. This interpretation of the standards is wholly unsupported: under the definition given in the HCS, an identification of a substance as a hazardous chemical does not depend upon the product's anticipated use at any particular worksite. The language of the standard supports the Secretary's view: a substance (*e.g.*, copper or graphite) either is or is not a hazardous chemical; the HCS definition cannot be read to indicate that a substance could be a hazardous chemical in some concentrations but not in others.

Moreover, the Preamble to the HCS, published in the Federal Register at the time of promulgation, shows conclusively that the Secretary considered and rejected the argument which General Carbon now advances:

A number of comments were received which indicated that hazard communication should not be required unless there is a "significant risk" or "unreasonable risk" of the employee's experiencing an adverse health effect under normal conditions of use.... OSHA does not agree that such an approach should be included in the final standard. The purpose of hazard communication is to ensure the disclosure of information about the possible hazards of chemicals in the workplace before the worker is exposed to them, and thus is at risk of experiencing adverse health effects. The hazard potential does not change even though the risk of experiencing health effects does vary with the degree of exposure.... The chemical manufacturer or importer, in making hazard determinations, should evaluate and communicate information concerning all the potential hazards associated with a chemical, whereas the employer may supplement this information by instructing employees on the specific nature and degree of hazard they are likely to encounter in their particular exposure situations.

48 Fed.Reg. 53,296 (1983).

In a subsequent passage, the Preamble rejected the argument that the information to be communicated should depend upon the product's expected downstream use:

It should also be noted that just as a chemical manufacturer cannot make specific control measure recommendations for unknown downstream uses, it also cannot accurately predict the hazard presented by the chemical downstream. Therefore, the chemical manufacturer must provide thorough hazard information, which would be applicable to a full range of reasonably foreseeable exposure situations, rather than limiting the information on the basis of presumed use. The downstream employer will then be assured of having the information reasonably necessary to make informed choices for control measures.

*Id.* at 53,307. This passage occurred in a discussion of the manufacturer's duty to

---

6. Even if General Carbon had sought to challenge the standards in this court, we believe that the challenge would be barred by the company's failure to present the argument to the Commission. *See* 29 U.S.C. § 660(a). General Carbon's petition for discretionary review of the ALJ's decision asserted that the standards had been misinterpreted but did not contest the validity of the standards themselves. *See* J.A. 61a–70a.

7. At the proceedings before the ALJ, the parties stipulated that copper and graphite are hazardous chemicals as defined by the standard. *See* J.A. 18a.

provide an MSDS and thus did not focus directly on the labeling requirement. And the MSDS is intended to set forth more detailed information than are the labels. The standards contain no suggestion, though, that a health hazard which is required to be reported on the MSDS can be omitted entirely from the labels. In fact, given the label's function in alerting employees to the more detailed information contained in the MSDS, it would make little sense to insist that a particular chemical be identified in the MSDS while imposing no corresponding labeling requirement.

The agency's approach to the labeling requirement presumes that manufacturers will generally be uncertain as to the downstream uses of their products and that appropriate labels should be based upon a sort of "worst case" scenario. The standards might, of course, have made this presumption a *rebuttable* one; that is, some form of waiver might have been made available to a manufacturer who could prove that, given the unique downstream uses of its product, the hazardous chemical would not in fact pose a hazard. Although such a waiver provision might have been included, neither the Preamble nor the standards themselves contain any suggestion whatsoever that an exception of this sort was intended. The Secretary's interpretation of the standards therefore appears to us to be amply supported.

### B. *Are General Carbon's Brushes Articles?*

■ The Hazard Communication Standards provide that "articles" are exempt from the labeling requirements. 29 C.F.R. § 1910.1200(b)(5)(iv). An article is defined as "a manufactured item: (i) Which is formed to a specific shape or design during manufacture; (ii) which has end use func-

tion(s) dependent in whole or in part upon its shape or design during end use; and (iii) which does not release, or otherwise result in exposure to, a hazardous chemical under normal conditions of use." 29 C.F.R. § 1910.1200(c). The dispute in the present case concerns the applicability of part (iii) of this definition.[8]

The Preamble to the HCS states that "[t]he purpose of this exemption is to ensure that items which may contain hazardous chemicals, but in such a manner that employees won't be exposed to them, not be included in the hazard communication programs. Examples of such items would be nuts and bolts or tools." 48 Fed.Reg. 53,293 (1983). General Carbon concedes that copper and graphite are hazardous chemicals, and that Delco employees who work with these brushes are exposed to copper and graphite dust, on their hands and in the air. The company nevertheless contends that the articles exemption should apply, since exposure levels in the Delco plant are far below the PELs for copper and graphite. The definition does not by its terms, however, require that exposure levels within a particular workplace be so high as to pose an actual danger in order for the labeling requirements to apply. And, as noted earlier, the Preamble to the HCS indicates that, while degree of risk is important when a downstream employer trains its workers, it is generally irrelevant in determining whether a duty to label exists.

Recently, when the Hazard Communication Standards were made applicable to nonmanufacturing companies, the agency indicated that manufactured items might qualify as articles if they release only "a few molecules or a trace amount" of a hazardous chemical. 52 Fed.Reg. 31,865 (1987).[9] This provision constitutes a nar-

---

**8.** The parties stipulated that the brushes meet the first two parts of the definition. *See* J.A. 14a, 18a.

**9.** The agency did not amend the definition of an "article" contained in the standard; it simply stated that the Department would interpret the exemption as applying to products releasing "a few molecules or a trace amount" of a hazardous chemical. Examples of chemical releases

deemed permissible under the articles exemption were "emissions from tires when in use; emissions from toner on pieces of paper; or emissions from newly varnished furniture." 52 Fed.Reg. 31,865 (1987). On August 8, 1988, the agency proposed amendments to the definition of an "article" which would explicitly provide that a product releasing "minute or trace amounts" of hazardous chemicals may still qual-

row exception to the general principle that degree of risk is irrelevant to the applicability of the labeling requirement. It does not, however, support General Carbon's argument that labeling is not required whenever the degree of risk "is both known and insignificant." *See* Brief for Petitioner at 32. Clearly, these brushes release more than "a few molecules" of carbon and graphite. The articles exemption therefore does not apply.

### C. *Are the Brushes Exempt From the Labeling Requirements as Mixtures?*

■ General Carbon also contends that the brushes are "mixtures" and are therefore exempt from the labeling requirements. This argument is without merit. The standards do not provide a *per se* exemption for mixtures. Rather, the standards simply provide that, if a mixture presents hazards other than those created by the underlying chemicals, its hazardousness is to be determined based on the characteristics of the mixture as a whole. 29 C.F.R. § 1910.1200(d)(5)(i). If, on the other hand, the dangers posed by the mixture are the same as those posed by its component parts—as seems clearly to be the case here —the manufacturer is still required to provide the labels appropriate for the underlying chemicals. Thus, even if the brushes here were deemed to be mixtures, General Carbon's duty to label would not be affected.

### D. *Was the Label Proposed by the Agency An Appropriate One?*

■ The standards require that "each container of hazardous chemicals leaving the workplace [must be] labeled, tagged or marked with ... [a]ppropriate hazard warnings." 29 C.F.R. § 1910.1200(f)(1). In the present case the agency required the following warning: "Dust may cause metal fume fever when inhaled or eye and mucous membrane irritation. Long-term exposure may lead to blood disorders, kidney and liver damage." J.A. 42a. General Carbon now argues that this warning is not "appropriate" because it overstates the

ify for the exemption. 53 Fed.Reg. 29,832–33

dangers to which the Delco employees will be exposed. If a warning is required, General Carbon contends, the company should be allowed to fashion a label which will more accurately advise the downstream workers of the risks to which they will be subjected.

This argument, however, is foreclosed by the petitioner's failure to present it to the Commission. During the administrative proceedings the company argued only that no warning should be required at all—not that alternative wording would be preferable. The governing statute expressly forbids us to consider arguments not advanced to the Commission. *See* 29 U.S.C. § 660(a); *GAF Corp. v. OSHRC*, 561 F.2d 913, 919 (D.C.Cir.1977).

The agency, we note in passing, demonstrated some willingness to negotiate over the content of the required label. Mr. Gary J. Anderson, OSHA's acting director for compliance in Washington, D.C., testified in the proceeding before the ALJ that "[t]hat label is not fixed in cement.... I would not have a problem if you added the words 'excessive dust' or 'high levels of dust' may cause metal fume fever when inhaled." Tr. 78. General Carbon apparently never pursued this opening. We do not rest our holding on this point: even if the agency had shown no inclination to negotiate, it would still have been incumbent upon the company to present its argument to the Commission before raising it here. We do, however, note the contrast between the agency's apparent flexibility and the "all or nothing" position which General Carbon adopted before the Commission.

### E. *Should General Carbon's Violation Have Been Characterized As De Minimis?*

■ The Act provides that "[t]he Secretary may prescribe procedures for the issuance of a notice in lieu of a citation with respect to de minimis violations which have no direct or immediate relationship to safety or health." 29 U.S.C. § 658(a). To char-

(1988).

acterize a violation as *de minimis* means not only that no penalty is imposed (none was imposed here in any event), but also that the violation need not be abated. *See Brock v. L.R. Willson & Sons, Inc.*, 773 F.2d 1377, 1386 n. 9 (D.C.Cir.1985).

■ The Secretary's basic position is that the violation is not *de minimis* because, *as a general matter*, providing workers with comprehensive information regarding possible workplace dangers bears a direct and immediate relationship to safety and health. The company's argument is that *this* warning in *this* workplace is unrelated to safety and health because the Delco employees face no danger to begin with. We believe that the Secretary's approach is more consonant with the spirit of the standards. The Preamble to the standards stresses that a manufacturer's duty to provide information should not be contingent upon the expected downstream uses of its products. We see no reason to require that the agency undertake such an inquiry in order to demonstrate that a violation is not *de minimis* and must be abated.

As we noted earlier, the Secretary might have provided for waiver of the labeling requirements in those cases where a manufacturer could establish conclusively that its products would pose no danger to downstream workers. The refusal to provide for waiver creates some regulatory imprecision, but it serves one clear purpose: it obviates the need for potentially burdensome case-by-case inquiries into the expected uses of products by downstream employees and the anticipated attendant risks.[10] Such inquiries would be every bit as burdensome if they arose in the context of claims that established violations were *de minimis*. We believe that the Secretary acted reasonably in characterizing General Carbon's violations as other-than-serious.

### III. CONCLUSION

■ The Secretary's position is that a chemical which may be dangerous in *any* concentration and under *any* circumstances is a hazardous chemical under *all* circumstances—that a manufacturer's duty to label is to be based upon a worst-case scenario. General Carbon argues in essence that the standards cannot mean what the Secretary says they mean because the standards, so interpreted, would be unreasonable. This assertion is plainly insufficient to overcome the abundant evidence that the Secretary has in fact interpreted the HCS correctly. The company's reasonableness arguments—and, similarly, its claim that the present enforcement action is violative of the Act—might more plausibly have been framed as a challenge to the validity of the underlying standards, not as a basis for contending that the standards have been misconstrued. General Carbon has foregone such a challenge, however, and we therefore have no occasion to consider the validity of the HCS. Since the Secretary's interpretation of the standards was reasonable, the petition is

DENIED.

---

10. A waiver provision would not require that an individualized inquiry as to the degree of downstream risk must be made in every case. Such an inquiry would be required only when a company introduced evidence tending to show that no significant risk existed. Even within that range of cases, however, the burden on the agency might be substantial.