**60 KEY CENTRE INC.,**
**Plaintiff–Appellant,**

v.

**ADMINISTRATOR OF GENERAL SERVICES ADMINISTRATION (GSA); Acquest Holding, Inc., Defendants–Appellees.**

**No. 205, Docket 94–6043.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 7, 1994.

Decided Feb. 1, 1995.

Donald G. McGrath, Buffalo, NY (Stephen F. Szymoniak, Falk & Siemer, of counsel), for plaintiff-appellant.

David E. Sipiora, Asst. U.S. Atty., S.D.N.Y., New York City (Mary Jo White, U.S. Atty., and Ping C. Moy, Asst. U.S. Atty., S.D.N.Y., of counsel), for defendant-appellee Adm'r of General Services Admin.

Victor C. Silverstein, Buffalo, NY (Lippes, Silverstein, Mathias & Wexler, of counsel), for defendant-appellee Acquest Holding, Inc.

Before: MESKILL, MAHONEY, and WALKER, Circuit Judges.

MAHONEY, Circuit Judge:

Plaintiff-appellant 60 Key Centre Inc. ("60 Key") appeals from a judgment entered February 3, 1994 in the United States District Court for the Western District of New York, Michael B. Mukasey, *Judge*,[1] that denied 60 Key's application for: (1) an injunction barring defendant-appellee Administrator of the General Services Administration (the "GSA") from proceeding with performance of an award of a lease for space (to be occupied by the offices of the United States Attorney for the Western District of New York) to defendant-appellee Acquest Holding, Inc. ("Acquest"); and (2) for a declaratory judgment directing the GSA to award the lease to 60 Key. *See 60 Key Centre Inc. v. Administrator of General Servs. Admin.*, No. 93 Civ. 0154A (MBM), 1994 WL 25842 (W.D.N.Y. Jan. 25, 1994) (opinion supporting judgment).

We affirm the judgment of the district court.

## Background

Until December 1993, the offices of the United States Attorney for the Western District of New York (the "U.S. Attorney") were located in the United States Courthouse at 68 Court Street, Buffalo, New York. In 1990, an extensive renovation and expansion project for the Courthouse was commenced, requiring that the U.S. Attorney vacate the premises by December 15, 1993. Consequently, the U.S. Attorney was required to find and lease new office space. The GSA, through its realty specialist Paul O'Brien, solicited bids.

O'Brien prepared a solicitation for offers ("SFO") that provided the specifications and other relevant information for a ten-year lease with two five-year renewal options (the "Lease"), and specified a deadline of February 26, 1992 for initial bids. The SFO required that bids remain open until August 3, 1992, but did not provide a deadline date for Best and Final Offers ("BAFOs"). 60 Key submitted its initial bid on February 25, 1992, but Acquest did not submit its initial bid until August 10, 1992, more than five months after the deadline for initial bids.

After receiving Acquest's bid, the GSA set the BAFO deadline as November 18, 1992; both 60 Key and Acquest submitted their BAFOs before the deadline. The GSA considered Acquest's bid even though it was submitted after the deadline for initial bids stated in the SFO, because General Services

---

1. The Hon. Michael B. Mukasey of the United States District Court for the Southern District of New York, sitting by designation. Because this case impacted upon the United States Court-house for the Western District of New York, the judges in that district recused themselves from this litigation. Judge Mukasey was designated to hear the case pursuant to 28 U.S.C. § 292(b).

Administration Regulation ("GSAR") § 552.270–3(a), 48 C.F.R. § 552.270–3(a), bars (with certain exceptions) the consideration only of offers received after the BAFO deadline. 60 Key, Acquest, and an entity called Court Tower were selected as the finalists in the bid competition.

The GSA relied on the five "Award Factor Criteria" listed in the SFO (security, quality, location, space layout, and delivery), as well as price, to assess the competing bids. 60 Key scored seventeen (out of 100) points lower than Acquest, and nineteen points lower than Court Tower, on the qualitative criteria. In addition, 60 Key's overall price for the initial and renewal terms of the leasehold was higher than the price in either Acquest's or Court Tower's bid.

On January 22, 1993, GSA awarded the Lease to Acquest. On January 29, 1993, 60 Key filed a bid protest with the General Accounting Office (the "GAO") pursuant to the procurement protest system established by 31 U.S.C. §§ 3551–3556, but the GSA determined, pursuant to 31 U.S.C. § 3553(d)(2), that Acquest should be permitted to continue its performance.[2] On February 23, 1993, 60 Key commenced the instant action, alleging that the award of the lease violated applicable federal laws and regulations and the SFO, and seeking (1) temporary and permanent injunctive relief prohibiting the GSA and Acquest from proceeding with the award of the Lease, and (2) a declaratory judgment directing the GSA to award the Lease to 60 Key.[3]

60 Key waited until June 3, 1993, however, to move for a preliminary injunction, and did not file a supporting memorandum until October 15, 1993. *60 Key Centre*, 1994 WL 25842 at *2. At 60 Key's suggestion, made during the oral argument of that motion on December 22, 1993, the district court combined the hearing of that motion with the trial on the merits. *Id.* The parties thereafter stipulated to the documents and deposition testimony which, together with the transcript of the December 22 hearing, constitute the record in this case. *Id.* By December 22, 1993, Acquest had completed construction of the project, and the GSA had preliminarily accepted the office space. By the time the district court's opinion was issued on January 25, 1994, the U.S. Attorney had moved into the new premises.

The district court's comprehensive and thoughtful opinion considered and rejected 60 Key's claims that the GSA had violated federal law, federal regulations, and the SFO in awarding the Lease to Acquest, *see id.* at *3–10, and we affirm substantially for the reasons stated in the opinion of the district court. We address only 60 Key's challenge to the timeliness of Acquest's bid.

The district court rejected that challenge, stating:

> Plaintiff contends also that the Acquest bid was late and should never have been considered. Initial offers were due February 26, 1992. Acquest's initial offer was not received until mid-August 1992. However, GSA regulations governing evaluation of BAFO's and the award of contracts

**2.** Section 3553(d) provides:

(1) If a Federal agency receives notice of a protest under this section after the contract has been awarded but within 10 days of the date of the contract award, the Federal agency (except as provided under paragraph (2)) shall, upon receipt of that notice, immediately direct the contractor to cease performance under the contract and to suspend any related activities that may result in additional obligations being incurred by the United States under that contract. Performance of the contract may not be resumed while the protest is pending.

(2) The head of the procuring activity responsible for award of a contract may authorize the performance of the contract (notwithstanding a protest of which the Federal agency has notice under this section)—

(A) upon a written finding—

(i) that performance of the contract is in the best interests of the United States; or

(ii) that urgent and compelling circumstances that significantly affect interests of the United States will not permit waiting for the decision of the Comptroller General concerning the protest; and

(B) after the Comptroller General is notified of that finding.

**3.** The complaint also alleged in a separate count that the GAO had acted arbitrarily, capriciously, and unlawfully by declining to make an expedited resolution of 60 Key's protest, but no relief was sought against the GAO, and the claim against the GAO was subsequently dismissed by stipulation.

are interpreted by GSA to permit evaluation of offers received after the deadline for initial offers, provided that BAFO's are timely.... In particular, 48 CFR § 552.270–3(a) contains th[e] following introductory language: "Any offer received at the office designated in the solicitation after the exact time specified for receipt of best and final offers will not be considered unless...." The regulation then goes on to specify the requirement for a postmark consistent with the timely mailing, and the like. However, the regulation makes it plain that the critical date is the deadline for BAFO's. Nor is this surprising. The point of the bidding process, after all, is to assure that the government can get the best deal. It would be pointless to shut out a potentially successful bidder at the beginning of the process when discussions are ongoing and the time for BAFO's has not yet passed. Here, the deadline for BAFO's was November 18, 1992. Plaintiff does not dispute GSA's claim that Acquest's BAFO was received on November 17, 1992. Thus, 60 Key's objection to the timing of Acquest's bid is without merit.

1994 WL 25842 at *5 (alterations partially added).

This appeal followed. During the pendency of this appeal, 60 Key called to our attention the decision, rendered after the district court's decision in this case, of the United States Court of Federal Claims in *Aerolease Long Beach v. United States*, 31 Fed.Cl. 342 (1994), *aff'd*, 39 F.3d 1198 (Fed. Cir.1994) (table). In *Aerolease*, the United States Court of Federal Claims ruled that GSAR § 552.270–3(a) invalidly permits the acceptance of proposals submitted after the deadline for initial proposals but before the deadline for BAFOs.[4] The Court of Federal Claims concluded that as construed to permit this result, § 552.270.3(a) conflicts with several federal statutes and regulations and is unfair. *See id.* at 365–68; *see also id.* at 375–79 (denying reconsideration).

We solicited letter briefs from the parties addressing (1) the correctness of the ruling in *Aerolease*, and (2) the proper disposition of this appeal if that ruling is correct. We conclude, contrary to *Aerolease*, that § 552.270–3(a) validly permits the submission of bids after the deadline for initial bids but prior to the deadline for BAFOs. We write only to explicate that conclusion.

### Discussion

It is well settled that an agency's interpretation of its own regulations is " 'of controlling weight unless it is plainly erroneous or inconsistent with the regulation.' " *United States v. Larionoff*, 431 U.S. 864, 872, 97 S.Ct. 2150, 2155, 53 L.Ed.2d 48 (1977) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)); *see also Thomas Jefferson Univ. v. Shalala*, —— U.S. ——, ——, 114 S.Ct. 2381, 2386, 129 L.Ed.2d 405 (1994); *Stinson v. United States*, —— U.S. ——, ——, 113 S.Ct. 1913, 1919, 123 L.Ed.2d 598 (1993); *Lyng v. Payne*, 476 U.S. 926, 939, 106 S.Ct. 2333, 2341, 90 L.Ed.2d 921 (1986); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *Ali v. Reno*, 22 F.3d 442, 446 (2d Cir.1994). When, however, a regulation "operates to create a rule out of harmony" with the statute under which it is promulgated, the regulation is considered a "nullity." *Manhattan Gen. Equip. Co. v. Commissioner*, 297 U.S. 129, 134, 56 S.Ct. 397, 400, 80 L.Ed. 528 (1936); *see also Larionoff*, 431 U.S. at 873 n. 12, 97 S.Ct. at 2156 n. 12.

The Court of Federal Claims concluded in *Aerolease* that GSAR § 552.270–3(a), as construed by the GSA, (1) conflicts with: 41 U.S.C. § 253a(b)(2)(B)(ii), a provision of the Competition in Contracting Act of 1984 ("CICA"), Pub.L. No. 98–369, Divison B, Title VII, 98 Stat. 1175 (1984); GSAR § 570.203(a)(4), 48 C.F.R. § 570.203(a)(4); and Federal Acquisition Regulation ("FAR")

---

4. The validity of GSAR § 552.270–3(a) was not raised as an issue on the appeal to the Court of Appeals for the Federal Circuit in *Aerolease*, apparently because the party against whom the ruling on § 552.270–3(a) was directed did not participate in the appeal. The validity of § 552.270–3(a) was not at issue before the district court in this case, and was not addressed in the parties' briefs to this court, which were filed prior to our receipt of 60 Key's letter pursuant to Fed.R.App.P. 28(j) that alerted this court to the *Aerolease* decision.

§ 15.412, and (2) operates unfairly with respect to bidders for government contracts. *See Aerolease,* 31 Fed.Cl. at 365–68; *see also id.* at 375–79 (denying reconsideration). We proceed to address these issues.

### A. The GSA's Interpretation of GSAR § 552.270–3(a).

GSAR § 552.270–3(a) provides in pertinent part:

> Any offer received at the office designated in the solicitation after the exact time specified for receipt of best and final offers will not be considered unless it is received before award is made and it [satisfies specified mailing requirements or is the only offer received].

48 C.F.R. § 552.270–3(a).

The GSA maintains that it has consistently interpreted and applied GSAR § 552.270–3(a) to allow for the consideration of bids received before the deadline for BAFOs. Thus, according to the deposition testimony of a GSA contracting officer, the date for the submission of initial bids stated in an SFO is "a date by which [the GSA is] looking to get ... expressions of interest," but the GSA "accept[s] offers up until close of best and final offers as a matter of policy." *See GBA Assocs. v. United States, Gen. Servs. Admin.,* No. C.A. 93–1442–A, slip op. at 13 (reasonable and acceptable for GSA to construe GSAR § 552.270–3 to permit consideration of offers received before BAFO deadline).

### B. Asserted Conflict with 41 U.S.C. § 253a(b)(2)(B)(ii).

■ 41 U.S.C. § 253a(b)(2)(B)(ii) provides in pertinent part that: "[E]ach solicitation for ... competitive proposals ... shall at a minimum include— ... the time and place for submission of proposals." 60 Key asserts, in its letter brief regarding this issue, that the specification of an initial due date *and* a bar of any subsequent offers is mandated by the quoted provision.[5] The statute's language does not require this reading, however, because Section 253a(b)(2)(B)(ii)

provides only that a time and place for bid submission must be stated in the SFO, and does not assert any penalty for bid submissions after this date. It cannot be disputed that the GSA included a time for submission of offers in the SFO, thus complying with the literal requirement of § 253a(b)(2)(B)(ii).

Further, the legislative history of CICA establishes that a predominant purpose of its enactment was to augment competition. As stated in *Abel Converting, Inc. v. United States,* 679 F.Supp. 1133 (D.D.C.1988):

> Following a careful review of federal government procurement procedures, Congress determined that at the time a majority of such procurement was achieved by noncompetitive procedures to the detriment of the government. S.Rep. No. 98–50, 98th Cong., 1st Sess. 7 (1984) [hereinafter "Senate Report"]. To correct this imbalance, Congress enacted CICA, Pub.L. No. 98–369, Division B, Title VII, 98 Stat. 1175 (1984), and established a statutory preference for the use of competitive procedures. Senate Report at 1.

679 F.Supp. at 1138.

In furtherance of this goal, 41 U.S.C. § 414(1) specifies that:

> To further achieve effective, efficient, and economic administration of the Federal procurement system, the head of each executive agency shall, in accordance with applicable laws, Government-wide policies and regulations, and good business practices—
>
> (1) increase the use of full and open competition in the procurement of property or services by the executive agency by establishing policies, procedures, and practices that assure that the executive agency receives a sufficient number of sealed bids or competitive proposals from responsible sources to fulfill the Government's requirements (including performance and delivery schedules) at the lowest reasonable cost considering the nature of the property or service procured[.]

The GSA's policy of allowing bids to be submitted up to the BAFO deadline effective-

---

**5.** 60 Key also invokes 41 U.S.C. § 253b(a), which states that: "An executive agency shall evaluate ... competitive proposals based solely on the factors specified in the solicitation." The claim

is that the specified initial due date is one of these "factors." This is a transparently implausible reading of § 253b(a).

ly enhances competition, as occurred in this case. Thus, we perceive no conflict between GSAR § 552.270–3 and either the literal requirements of 41 U.S.C. § 253a(b)(2)(B)(ii) or the underlying policy of CICA to enhance competition.

### C. Asserted Conflict with GSAR § 570.203(a)(4).

Section 570.203(a)(4) simply reiterates the mandate of 41 U.S.C. § 253a(b)(2)(B)(ii), requiring that SFO's "[s]pecify a date and place for the submission of offers." For the reasons already stated, we perceive no conflict between GSAR §§ 552.270–3(a) and 570.203(a)(4).

### D. Asserted Conflict with FAR § 15.412.

Section 15.412 states in pertinent part:

(b) Offerors are responsible for submitting offers, and any modifications to them, so as to reach the Government office designated in the solicitation on time. . . .

(c) Proposals, and modifications to them, that are received in the designated Government office after the exact time specified are *late* and shall be considered only if (1) they are received before award is made, and (2) the circumstances, including acceptable evidence of date of mailing or receipt at the Government installation, meet the specific requirements of the provision at 52.215–10, Late Submissions, Modifications, and Withdrawals of Proposals.

48 C.F.R. § 15.412(b), (c).

Plainly, this provision spells out the *consequences* of a late submission, but does not mandate any particular action by the GSA with respect to setting the deadlines to which those consequences will attach. Moreover, the provision does not define what constitutes a late submission, and therefore does not contradict the GSA's policy of accepting proposals before the deadlines for BAFOs.

### E. Fairness Concerns.

*Aerolease* stressed the "unfairness" of allowing a late bidder to compete with bidders who met the initial deadline for submission of bids, and undertook to keep their bids open during a period when the late bidder assumed no similar obligation. *See* 31 Fed.Cl. at 365–68; *see also id.* at 378 (denying reconsideration). All of the initial bidders in this case were or should have been aware, however, of the GSA's policy to allow late bids until the BAFO deadline. Further, parties like 60 Key who submit bids by the initial date specified in the SFO have the competitive advantage of additional time to negotiate an acceptable bid by the BAFO deadline. In any event, the statutes and regulations that govern federal procurement policies "are not designed to establish private 'entitlements' to public business, but rather to produce the best possible contracts for the government in the majority of cases." *Delta Data Systems Corp. v. Webster,* 744 F.2d 197, 206 (D.C.Cir. 1984).

In sum, we perceive no innate unfairness in a procurement system that encourages early submission of proposals, but does not deprive the government or the public of the benefit of later, more advantageous offers.

### Conclusion

The judgment of the district court is affirmed.