[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, William C. Munroe, is a former employee of defendant Emhart Corporation which merged with defendants B. D., Inc. and The Black and Decker Corporation in April, CT Page 7934 1989. In October of 1988 Munroe held the position of International Counsel at Emhart and had been employed there for approximately 28 1/2 years. During the period of his employment he was considered one of Emhart's key employees and was thus given the right to hold certain stock options. (Plaintiffs Exs. E, F, and G). The stock option plans, which governed the permissible exercise of his stock options, provided that a certain percentage of the stock options would be exercisable over a period of years. The plans provided the following in regard to termination of employment.
"Termination of Employment. Upon termination of an option holder's employment for any reason other than death or deliberate, willful, or gross misconduct, his option shall be exercisable only to the extent he would have been permitted to purchase shares under his option at the date of such termination, and such option shall expire unless exercised within the three (3) month period following the date of such termination . . ."
By letter dated October 20, 1988 Munroe was informed that due to corporate reorganization his employment would be terminated effective January 31, 1989 (Plaintiffs' Ex.H). The termination letter was in the form of a termination agreement which Munroe was asked to sign. The agreement provided for certain enumerated benefits which Munroe would receive upon his termination. These benefits included severance pay, medical coverage, pension benefits, accrued vacation pay, and access to the Emhart Employee Assistance Program. In regard to stock options the agreement provided the following:
"Any rights which you may have following your separation date under outstanding stock options granted to you will be determined in accordance with the terms of the respective stock option plans under which the options were granted and in accordance with the terms of the respective option agreements evidencing such stock options."
The termination agreement thus incorporated by reference Emhart's stock option plans and stock option agreements pursuant to which Munroe had been granted his stock options.
Prior to signing the termination agreement Munroe made inquiry as to what stock options he could exercise as of the day of his termination. He received a response from the CT Page 7935 corporate secretary, C.M. Hussey, by memo dated November 22, 1988. The memo indicated what vested stock options he could and could not exercise. Nothing was mentioned about any unvested shares which Munroe held. Munroe signed the termination agreement on December 19, 1988. (Ex.I). When he signed the termination agreement he was unaware that the Board of Directors was in the process of considering changes in the stock option plans.
On December 22, 1988, after the termination agreement was signed, the Board of Directors of Emhart passed a resolution which proposed a change to the stock option plans. The amendment to section 6(e) of the Stock Option Plans adopted pursuant to the resolution provided in part as follows:
"(e) Termination of Employment Other Than by Misconduct orDeath. Upon termination of an option holder's employment for any reason other than death or deliberate, willful, or gross misconduct, his option shall be exercisable only to the extent he would have been permitted to purchase shares under his option at the date of such termination, and such option shall expire unless exercised within the "Applicable Exercise Period" as hereinafter defined . . . The "Applicable Exercise Period" shall be the three (3) month period following the date of the option holder's termination of employment . . . If an option holder's employment is terminated for deliberate willful, or gross misconduct as determined by the Company, all rights under his option shall expire upon receipt by him of notice of such termination or the effective date thereof, whichever shall be earlier." (Ex.O, Admission 29)
As a result of the resolution passed by the Emhart Board of Directors on December 22, 1988 its stock option plans were amended effective December 22, 1988 to include the following provision:
 "6. (i) Effect of a Change in Control. Notwithstanding Subparagraphs (b) or (e) above, in the event of a Change in Control, as hereinafter defined, all options outstanding on the date of such Change in Control shall become immediately and fully exercisable." (Ex.O, Admission 60)
The Board also passed the following resolutions on December 22, 1988: CT Page 7936
"RESOLVED: That the officers and directors of the Corporation are hereby authorized and directed to execute all such documents as they shall deem necessary or appropriate in order to effectuate the resolutions adopted by the Board of Directors and/or the Management Compensation and Stock Option Committee with regard to the grant of stock options under the 1988, 1986, 1983 and 1979 Stock Option Plans . . . and all actions heretofore or hereafter taken by any director or officer of the Corporation within the terms of such resolutions be, and they hereby are, ratified, confirmed and approved as the act and deed of the Corporation."
"RESOLVED: That the form, terms and provisions of the Amendment to the 1986 [1983] Stock Option Plan (the "Plan") substantially as presented to this meeting, with such modifications therein as shall be approved by the Chairman of the Board, the President, any Executive Vice President or any Senior Vice President of the Corporation with the concurrence of outside counsel be, and they hereby are, approved and adopted in all respects, provided, however, that such Amendment shall not apply to the Scheme for United Kingdom Stock Options which shall continue to be governed by the unamended provisions of the Plan unless and until the United Kingdom Board of Inland Revenue shall have approved the Amendment. Upon such approval, the Amendment shall be deemed to be effective as of the date hereof with respect to the Scheme and any option granted thereunder provided that the Amendment shall, for purposes of the Scheme and any option granted thereunder, be deemed to take effect subject to any conditions or modifications required by the Inland Revenue.
"RESOLVED: That the Management Compensation and Stock Option Committee shall amend the stock option agreements evidencing options outstanding under the 1986 [1983] Stock Option Plan on the date such Amendment is adopted to reflect the terms of such Amendment." (Ex.O. Admission 61)
On January 31, 1989 Munroe wrote a letter to J. Michael Stepp, Treasurer of Emhart regarding his stock options. In the letter he exercised certain of his vested stock options. In addition, he requested that he be allowed to exercise the remaining vested stock options which Mr. Hussey had said were not exercisable. (Plaintiffs' Ex.J). Mr. Stepp did not reply to the letter. On March 17, 1989 Munroe sent another letter CT Page 7937 to Mr. Stepp. In that letter he mentioned that he was aware that management had provided that a Change in Control would accelerate the options of all present employees, and he said he was unclear if this would apply to him. Thus, as of March 17, 1989 he was under the belief that his unvested shares were not exercisable, and he was asking that he be treated in the same way as the president whose stock options had been accelerated.
On March 22, 1989 Munroe wrote to Robert Byrnes, Senior Vice President of Emhart. In this letter he mentioned that he had read of the proposed merger and change in control and requested that his remaining stock options be accelerated.
On April 4, 1989 R.F. Vitkus sent a memo to Emhart Option Holders. It stated in pertinent part as follows:
"The merger agreement between Emhart and Black Decker provides that immediately following Black Decker's purchase of Emhart shares under the Tender Offer, all outstanding Emhart stock options, whether or not currently exercisable, will become fully exercisable and vested, and the option holders will be entitled to receive an amount of cash for each option share equal to the "spread" between the option exercise price and the Tender Offer price of $40 per share. Payment for your options, less applicable withholdings if any, should be made within one week following Black Decker's purchase of Emhart stock, currently scheduled to occur on April 18, 1989." (Defendants' Ex.3).
In spite of that memo, Byrnes wrote to Munroe by letter dated April 19, 1989 and told him that he would be able to exercise the 750 remaining vested incentive stock options "provided that the change of control occurs by April 30 . . ." However, Byrnes told him he would not be able to exercise the unvested stock options. Thus, as of April 19th Munroe was under the belief that he was not entitled to payment for his unvested portions of his stock options.
On April 28, 1989 Munroe received a cash-out memo and check. By this time he had been paid for all his vested shares, but not for his unvested shares. When he cashed the check he did not believe, based on the stock option plans as he knew they existed at the time, that he was entitled to receive any money for his unvested shares. He had assumed CT Page 7938 that Byrnes knew what his rights were in that regard.
In September of 1989 Munroe received a copy of the board of directors vote which amended the stock options plans. For the first time he became aware that he might be entitled to collect on the additional outstanding unvested shares. In this suit he seeks to be paid $46,932.88 which is the agreed value of the 2,324 unvested shares which he held at the time of his termination. The defendants have raised the defense of accord and satisfaction.
A similar case was brought in the federal court on behalf of two other key employees, namely Charles E. Lamb and John F. Bradley, Lamb v. Emhart Corp. 47 F.3d 55 (2nd Circ. 1995) Munroe was not a party to that action. In that case, however, Lamb and Bradley like Munroe had been key employees with Emhart. Like Munroe they held stock options pursuant to the stock option agreements and stock option plans similar to Munroe's. Like Munroe they were terminated as of January 31, 1988. Like Munroe they had signed termination agreements which contained the identical provision concerning their outstanding stock options. Like Munroe they were the holders of unvested stock options which were not exercisable at the time of their separation. As in the Lamb and Bradley case, Emhart's Board of Directors amended the Stock Option Plans on December 22, 1988 to include a Change in Control provision. That provision added section 6(i), "Effect of a Change in Control" which made all outstanding options immediately exercisable in the event of a Change in Control of the company. Like Munroe, Lamb and Bradley never received a letter explaining the effect of the Amendments on the Plans and agreements and never consented to amendment of their agreements. Like Munroe, Lamb and Bradley at the time of separation had stock options which did not expire until April 30, 1989. As in the federal court case the Change in Control amendments were triggered on April 28, 1989.
In the federal court case the Court studied the stock option plans and agreements, the stock option provisions set forth in the termination agreements, and the Change in Control Amendments. It concluded that the amendments were incorporated in the termination agreements by reference and that the plaintiffs' options were outstanding at the time of their separation. It concluded that Bradley and Lamb were entitled to be paid for their outstanding unvested shares. CT Page 7939
Because of the similarity of the two cases Munroe claims that he is entitled to judgment in accordance with a theory of Collateral estoppel even though he was not a party in the federal court case. The Court agrees that defendants are estopped from seeking to have this court reinterpret the provisions of the stock option plans, the stock option agreements, the pertinent provisions of the termination agreement, and the Change in Control Amendments. The issues raised in regard to the federal court's interpretation of those provisions have been fully litigated. In any event, even if Collateral estoppel did not apply, this court would come to the same legal conclusions in interpreting those provisions.
The Court believes, however, that collateral estoppel does not apply to the defendant's special defense of accord and satisfaction. As stated above, Munroe was not a party to the federal action. Whether the defense of accord and satisfaction applies to him is a factual issue which was not litigated in the federal action. Thus the court will address the special defense of accord and satisfaction.
Emhart contends that the evidence established at trial that Munroe's acceptance of cash-out checks constituted an accord and satisfaction. The court disagrees. "In order to prove an accord and satisfaction, the defendant must show that at the time of the agreement a good faith dispute existed over the existence of a debt or over an amount owed, and that the debtor and the creditor negotiated a contract of accord to settle the claim . . . The accord must be a new agreement based on new consideration . . . The proponent must be able to show that there was a meeting of the minds, and that the offer by the debtor was clearly rendered as full satisfaction of the debt, and the payment was knowingly accepted" Lamb v. EmhartCorp. 47 F.3d 551, 562 (Citations omitted) Munroe received a letter dated April 19, 1989 from Mr. Byrnes (Ex.M) in which he was told it was not possible to change the status of his unvested options. Munroe testified that he had no reason not to believe him. Also when he cashed the check which he received with a cash-out memo on April 28, 1989 he believed that he had received everything that he was entitled to receive. Thus, he had no dispute at that time regarding the amount of the check. As he stated at trial, he accepted Mr. Byrnes' position that he was not entitled to a cash-out for CT Page 7940 his unvested shares. Clearly, there was no good faith dispute which was negotiated.
When Munroe cashed the check, he had no knowledge that cashing the check would extinguish his rights. The Court concludes that no accord existed between the parties. Thus, the Court finds that he is entitled to be paid the sum of $46,932.88 for his unvested shares.
The Court notes that the plaintiff filed with the court offer of judgment in the amount of $34,000 on March 14, 1991, less than eighteen months from the filing of the complaint. Thus, the plaintiff is entitled to 12% interest on $46,932.88 from June 20, 1990, the date when the complaint was filed with the court. (General Statutes § 52-192a(b)
Accordingly, judgment may enter for the plaintiff against the defendants in the amount of $46,932.88, plus 12% interest from June 20, 1990 to the date of this judgment, plus costs.
Allen, State Referee